MERCHANTS' LIFE ASS'N OF UNITED STATES v. YOAKUM.

(Circuit Court of Appeals, Fifth Circuit. November 21, 1899.)

No. 800.

1. LIFE INSURANCE—ACTION ON POLICY—DEFENSES.

One who takes out a policy of insurance on his life for the benefit of his estate has the right to procure from another the money with which to pay the premium thereon, and the terms of the contract between them are immaterial to the company issuing the policy, and can constitute no defense to an action thereon.

2. PLEADING—AMENDMENTS DURING TRIAL—TEXAS STATUTE.

Under the statute of Texas (Rev. St. 1895, art. 1188) which provides that all amendments to pleadings must, when court is in session, be filed under leave of court "before the parties announce ready for trial, and not thereafter," while amendments during trial may be permitted in the discretion of the court, and in furtherance of justice, a refusal of such permission is not error unless an abuse of discretion is shown.

3. EVIDENCE—ADMISSIONS—PARTY IN INTEREST.

In an action by an administrator on a policy of insurance on the life of his decedent, payable to his estate, the widow of the deceased is not such a party in interest that statements made by her constitute admissions affecting the plaintiff's right of recovery.

4. TRIAL—ORDER OF ADMITTING TESTIMONY.

A trial court may, in its discretion, permit a defendant at the time of cross-examination of a witness for plaintiff to make the witness his own, and examine him as to matters of defense, but the better practice, where the convenience of the parties and the witness will permit, is to limit defendant at that time to cross-examination, leaving him to recall the witness when the defense is reached.

5. WITNESSES—IMPEACHMENT—RIGHT TO CONTRADICT TESTIMONY.

In an action by an administrator on a policy of insurance on the life of his decedent, where the defendant called the widow of the deceased as a witness, and examined her as to matters immaterial to the issues, it was bound by her answers, and it was not error to refuse to permit it to show

inconsistent prior statements made by her for purposes of impeachment, especially where her only testimony as a witness for plaintiff had been as to matters not in dispute.

**6. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS — STATUTE AFFECTING BUSINESS OF LIFE INSURANCE.**

The provisions of Rev. St. Tex. 1895, art. 3071, making life insurance companies failing to pay a loss within the time specified in the policy after demand made therefor liable to the payment of 12 per cent. damages on the amount of the loss, and all reasonable attorney's fees for the prosecution and collection of such loss, is not in violation of the fourteenth constitutional amendment, as denying to such companies the equal protection of the laws; but, in view of the magnitude and the peculiar nature of the business, of the fact that in making the contracts the parties do not deal on equal terms, but the terms of the contract are dictated solely by the insurer, and are often not understood by the insured, and the contracts are made in its behalf by agents whose power to bind their principal by their acts or knowledge is carefully limited, and the further fact that such contracts are not to be enforced usually until after the death of one of the parties thereto, such statute must be regarded as one making a classification having reasonable relation to the peculiar nature of the business affected and the object to be attained, which is to secure a righteous degree of care and fairness in the making of such contracts.

**7. FOREIGN CORPORATIONS—STATE LAWS REGULATING—CONTRACTS OF LIFE INSURANCE.**

Such statute is also, as applied to foreign life insurance companies, a legitimate and valid exercise of the power of the legislature to prescribe conditions upon which such companies are permitted to do business in the state, and is a condition of every contract made by such companies in the state since its enactment.

In Error to the Circuit Court of the United States for the Northern District of Texas.

D. A. Kelley, for plaintiff in error.

George Clark and D. C. Bolinger, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This was an action upon a policy of life insurance issued by the plaintiff in error on the life of John I. Hassler, the intestate of the defendant in error. The plaintiff in error (the defendant below) answered (1) by a general demurrer, upon which no action of the court was taken; and (2) by the general issue; and then specially as follows:

"(3) Further answering specially herein, this defendant says that it is not liable upon the policy of insurance sued on herein, and that it ought not to be compelled to pay the same, for the reason that said policy of insurance was obtained fraudulently, and is null and void, by reason of the following facts, to wit: This defendant says that said policy of insurance sued on herein, which is shown and described in the plaintiff's petition, was based upon a written and printed application therefor dated and signed by John I. Hassler, the deceased, being plaintiff's testator, on the 28th day of September, 1897, wherein said Hassler, among other things, was required to answer as to how long prior to said application it had been since he was attended by a physician or had to consult one, and that he answered thereto, 'May and June, last,' which meant May and June of the year 1897. And further, in said application he was required to answer if he had ever had any disease of the throat, lungs, heart, liver, kidney, or bladder, and that he answered thereto 'No,' meaning thereby that he had never had, nor was he at that time affected with, any of the diseases called for in said question indicated aforesaid. And it is further alleged that in said application the said John I. Hassler was required to an-

swer whether or not he had ever had shortness of breath, or habitual cough, or pneumonia, or spitting of blood, and that he answered 'No,' thereby meaning that he had never been, and was not then, affected with any of said ailments or diseases. And it is further alleged that the said John I. Hassler was further required in said application to answer whether or not he was then, and if he was usually, in good health, and that he answered 'Yes,' thereby meaning that he was then in good health, and that he was usually in good health. And it is further alleged that the said John I. Hassler was also required in said application to answer if he had enjoyed good health in the past twelve months prior to said application, to which he answered, 'Yes, except an attack of malarial in May and June last,' thereby meaning that he had enjoyed good health except as to an attack of malarial fever during the time stated. Now, this defendant says that the foregoing answers of the said John I. Hassler were false in this: It is alleged that at the time said application was made and said answer given as hereinbefore stated, and at the time of the issuance and delivery of the policy of insurance sued on herein, the said John I. Hassler was not in good health, but, on the contrary, was in bad health, and that he had a disease of the throat commonly called 'bronchitis,' and he also had shortness of breath, and an habitual cough, and a frequent spitting of blood; and he also had a disease of the lungs commonly called 'pulmonary consumption,' which finally resulted in his death; and that he was in a feeble condition, and unable to attend to his usual avocation, which was that of a truck gardener; and that from the time of the alleged attack of malarial fever to the date of said application said Hassler had frequent occasions to consult, and did consult, a physician with reference to his physical condition. This defendant further says that, if it had known of the true physical condition of said Hassler at the time he made said application and at the time said policy was issued, it would never have issued said policy, but would have rejected the application of said Hassler for insurance, and would have refused to issue the policy sued on, and would have refused to take any risk whatever upon the life of said Hassler; and, if it had known of said Hassler's condition at the time said policy was delivered, it would not have delivered the same. And this defendant further says that all of the statements and answers made by said Hassler in reply to the questions which he answered in said application, as hereinbefore stated, were material, and that by the terms of said application he consented and agreed that they should be material, and that they were warranties, and that they were true and complete, and that they were made as a basis for the issuing of the policy then applied for and which is here now sued on; and it was further agreed, as shown by the terms of said application, that said policy then applied for should not take effect or be binding upon this defendant unless and until said policy was issued and delivered to him during a continuance of the good health of said Hassler, which was meant that said Hassler was in good health, and not subject to any of the diseases or ailments hereinbefore referred to, both at the time he applied for said insurance, which was on the 28th day of September, 1897, and also at the time said policy was issued, which was on the 7th day of October, 1897, and at the time said policy was delivered, which was on the 15th day of November, 1897; and it is further alleged that he was not in good health either at the time that he applied for said policy or at the time it was issued, aforesaid, or at the time said policy was delivered; but it is alleged that he was in bad health, and affected with the diseases and ailments hereinbefore stated and referred to, at the date of said application, and at the time said policy was issued, and at the time it was delivered, as aforesaid, which operated as a fraud upon this defendant, and rendered said policy sued on null and void. This defendant further says that the plaintiff herein is personally interested in the recovery herein sought by him as executor, and that he was a party to the fraud hereinbefore shown, wherein this defendant was induced to issue and deliver the insurance policy sued on, in this: This defendant says that the plaintiff herein was acquainted with said John I. Hassler several years prior to the procurement of the policy sued on, and knew him to be in feeble health, and not a fit subject for the procurement of insurance on his life upon the basis of his being in good health, and had good reason to believe that he was affected with a disease of the lungs, which rendered him wholly un-

worthy as an applicant for insurance upon his life; and, notwithstanding this, it is alleged that the plaintiff entered into a conspiracy with the said John I. Hassler for the purpose of procuring the policy of insurance sued upon, and as a matter of speculation for the benefit of the plaintiff herein, and that he procured and induced said Hassler to make said application for insurance, and brought him in contact with the defendant's agent, with the fraudulent design aforesaid, and with full knowledge of said Hassler's condition, as aforesaid; and that upon said Yoakum ascertaining that said policy had been written in the name of said Hassler's wife as beneficiary, he (the said Yoakum), before said policy was delivered, acting in conjunction with said John I. Hassler, procured the said policy to be changed so that the amount therein named should be paid to the estate of said Hassler instead of to his wife, as hereinbefore stated; and, in addition to this, and in still furtherance of his scheme and design, in conjunction with said John I. Hassler, to defraud this defendant, the plaintiff, on, to wit, the 15th day of November, 1897, paid the premium called for in said policy, and then and there had said policy delivered on said 15th day of November, 1897, and on the said day, and before the same was so delivered, said Yoakum took judgments against said John I. Hassler for the sum of $4,000 in the district court of McLennan county, Fifty-Fourth judicial district, upon a waiver of service and confession by said Hassler upon a pretended note for the sum of $4,000, made by said Hassler to said Yoakum, dated the 8th day of November, 1897, bearing 6 per cent. per annum interest, and to become due on the day that it was executed, aforesaid, without grace. And it is further alleged that on the said 15th day of November, 1897, said Yoakum and said Hassler still further intended to defraud this defendant for the benefit of said Yoakum, and said Hassler executed his last will and testament, wherein and whereby he appointed said Yoakum his executor without bond, with the power to administer his estate out of court, and to pay all of the debts against his estate, etc., which said will was subsequently probated, as stated in plaintiff's petition. This defendant further says that said note for $4,000 was wholly without consideration, and that there was no basis for the same, and that there were no transactions between said Hassler and plaintiff Yoakum wherein and whereby said Hassler was indebted unto the said Yoakum in said sum of $4,000, or any like amount, except such obligation as may have arisen between said Hassler and Yoakum in carrying out said conspiracy to defraud this defendant. Of these matters the defendant is ready to verify, and the defendant prays that said policy of insurance be canceled and annulled, that this defendant be allowed to go hence, and that this defendant be also allowed to refund, and pay to whomsoever this court may adjudge, the $233.55 received by this defendant as a premium for the issuance of said policy, and which amount this defendant here now tenders and offers to pay subject to the orders of this court.

"Penry & Garrett,<br>
"D. A. Kelly,<br>
"Attorneys for Defendant."

On the trial the court, on its own motion, charged the jury as follows:

"In this case the plaintiff, William Yoakum, executor of the estate of John I. Hassler, deceased, as such executor, sues the defendant, the Merchants' Life Association of the United States, to recover loss upon a contract of life insurance entered into between John I. Hassler, deceased, and the defendant insurance company, and for statutory damages, and all reasonable attorney's fees for the prosecution and collection of the loss, alleged to have accrued to the plaintiff under the provisions of the statute of the state of Texas relative to and controlling the operation of life insurance companies in the state of Texas. The defendant, among other things, sets up and alleges as a defense to this cause of action that the insurance policy sued upon was obtained upon the faith of an application made by John I. Hassler, the deceased, wherein he was required to answer, among other things, the following questions: 'How long since you were attended by a physician, or had occasion to consult one?' to which he made answer, 'May and June last.' '(2) Have you had any disease of the throat or lungs?' to which he made answer, 'No.' '(3)

Have you had any shortness of breath, habitual cough, or pneumonia?' to which he made answer, 'No.' '(4) Are you now, and usually, in good health?' to which he made answer, 'Yes.' '(5) Have you enjoyed good health in the past twelve months?' to which he made answers, 'Yes, except an attack of malarial in May and June last.' You are charged that the answers to these questions are by the terms of the policy of insurance made a part of the contract, and are made material, and constitute warranties upon the said Hassler and his estate to the effect that each and all of said answers were literally true as given. If you believe from the testimony that either one of the answers made to any one of the above-enumerated questions by the deceased was not literally true, then it would be your duty to find a verdict for the defendant. The question which you are called upon to decide is, did John I. Hassler make literally true answers to the questions propounded to him as above enumerated? And if you believe from the evidence that his answers to each of the questions propounded were literally true, it would be your duty to find for the plaintiff; and the burden of proof is upon the defendant company, and it must establish by a preponderance of the evidence, the falsity of either one or more of the answers to said questions, in order to sustain its contention in this case. And if it has failed to establish the falsity of either one or more of the answers to the above questions by a preponderance of the evidence, it would be your duty to find for the plaintiff. The representation that a person is in good health at the time he applies for life insurance does not mean that he is entirely free from disease, but that he is in an ordinary state of health, and that he is not affected with any disease tending to increase the risk of the insurance company, and that he is free of any disease to the vital organs, or that might jeopardize the applicant's life. You will bear in mind this construction of the term 'good health' in reaching your conclusions as to the truth or falsity of the answers of the deceased, Hassler, to the questions as to whether or not he was at the time of the application, and usually, in good health, and as to whether or not he had enjoyed good health in the past 12 months. If you find that the defendant company was liable to pay the loss accrued by the death of John I. Hassler upon the policy sued on, and if you find that the defendant company has failed to pay the same in the time specified in said policy, to wit, thirty days, and if you further find that said demand was made upon said company for said loss, then, in the event you should find for the plaintiff, it will be entitled to recover, and you should so find in your verdict, 12 per cent. damages on the amount of such loss, together with all reasonable attorney's fees for the prosecution and collection of such loss, and also 6 per cent. interest on said loss from date of the demand therefor. You are instructed that the note executed by John I. Hassler, deceased, to William Yoakum, executor, as well as a judgment rendered thereon, and the last will and testament of John I. Hassler, deceased, and probate thereon have been admitted in evidence, not for the purpose of having the jury in this case pass upon the validity of either of said documents, but merely as facts bearing upon the issue as to whether or not there was fraudulent conspiracy or combination between the said John I. Hassler, deceased, and William Yoakum, to defraud the defendant company in the procurement of the policy upon the life of John I. Hassler sued upon in this case, and in pursuance of said conspiracy the deceased, Hassler, made false answer or answers to any one or more of the questions above enumerated. If you find from the evidence that the answers of John I. Hassler above enumerated were literally true, then said judgment, will, and probate become immaterial, and you will not consider them."

The court refused to give certain charges requested by the defendant. The jury returned a verdict for the plaintiff, on which the court rendered judgment.

The plaintiff in error submits that the circuit court erred in refusing to give to the jury the following requested charge:

"You are further instructed that, if you believe from the evidence that William Yoakum was not a creditor of John I. Hassler, and that Hassler did not owe him $4,000, or any like sum, and you further find that said Yoakum paid

the premium for the insurance shown in the policy sued on, with the understanding that he was to get the benefit of the insurance represented by said policy, or any part thereof, on account of said payment made by him for the premium, then you are instructed that said Yoakum would not have any insurable interest in the life of said John I. Hassler; and, if you so believe, you will find a verdict for the defendant."

The answer shows that the deceased made application for the insurance on the 28th of September, 1897. The witness Fitzhugh testified that he was the defendant's agent at Waco; that he learned that Mr. Hassler wanted insurance; that he learned this in this case in the same way that he did in other cases; that he was not able to remember who told him; the first time he talked with the deceased about taking out insurance was in the office of one Easterling; that the policy is dated the 7th of October, 1897, and it came to the hands of this witness, the defendant's agent at Waco, about the 10th of that month; that Hassler was not at Waco at the time the policy arrived, but was at Colorado City, and that the witness wrote to him at that place; that, in accordance with the application, the policy was written payable to Hassler's wife as the beneficiary; that about the 15th of November, 1897, at Hassler's house in Waco, Yoakum being present, Hassler's wife signed the request to the company to have the policy changed as to the beneficiary, so that, instead of being for herself, it should be in favor of Hassler's estate; that the premium—$233.55—was paid by Yoakum; that the policy is a 10-year policy,—that is, the party pays for 10 years, and then has a paid-up policy. The witness says that this is the most expensive kind of insurance; that the annual premium on this policy for $5,000 is $233.55,—that is, $46 per $1,000 for a man 46 years old; that a straight policy, without the tontine feature, would have cost only $18 per $1,000, or $90 for $5,000; that the amount of annual premium paid by Hassler—$233.55—would have secured a straight policy, without the tontine feature, for $20,000, or more, though the defendant company would not write a policy for over $10,000. It is clear from this evidence that Yoakum advanced to Hassler the money to pay this first premium. It is equally clear that this advance was not made until more than a month after the date of the policy, and immediately before, and in order to secure, its delivery to the insured.

The action in this case is not brought by a stranger or by a creditor, but by the executor of the last will and testament of Hassler, on a policy of insurance obtained on the application of the testator, intended originally for the benefit of his wife, and at her request changed so as to inure to the benefit of his estate, doubtless with the view to enable him to use it as a security to obtain an advance of the necessary premium proportionate to the amount and character of the insurance desired. Any person has a right to procure an insurance on his own life, and to assign it to another, provided it be not taken by way of cover for a wager policy. Hassler had a right to take out a policy on his own life for the benefit of his estate, and he had a right to procure an advance from Yoakum to pay the premium required to obtain the policy of insurance, and the terms of his contract with Yoakum with reference to the advance

were and are wholly immaterial to the company writing the policy. It gets a perfect quid pro quo in the stipulated premiums. It cannot justly refuse to pay the insurance when incurred by the terms of the contract. Insurance Co. v. Schaefer, 94 U. S. 457, 24 L. Ed. 251; Insurance Co. v. France, 94 U. S. 561, 24 L. Ed. 287.

The second assignment of error submits that the court erred in its charge to the jury touching the warranties relied upon in the answer of the defendant below in that the charge in reference thereto is contradictory and confusing, and the jury was authorized by it in believing that, if only one of the answers was false, this was not sufficient to set aside the policy, but that the defendant must show that all of them were false, before the jury could find in defendant's favor,—in other words, that the answers to all of the questions might be false except one, still the defendant could not recover; and that the court erred in refusing to give to the jury the defendant's request for the following instruction:

"Now, if you believe from the testimony that either one of said answers [being the same as those quoted in the charge of the court above] was not true and complete in every respect, then you are instructed to find a verdict for the defendant."

This assignment is not supported by the record, as we read it. The charge of the court is not subject to the criticism passed upon it by the counsel for the plaintiff in error. It appears to us that only the bias of interest or of advocacy could lead to the conclusion that the charge authorized the jury to find for the plaintiff, although it should be satisfied that the defendant had shown that the answers to one of the questions were not true. On the contrary, it appears to us that the charge is rather subject to the criticism of being overstrict in the rule it puts on the plaintiff. The plaintiff, having recovered, does not complain of this strictness. The charge says:

"You are charged that the answers to these questions are, by the terms of the policy of insurance, made a part of the contract, and are made material, and constitute warranties upon the said Hassler and his estate, to the effect that each and all of said answers were literally true as given. If you believe from the testimony that either one of the answers made to any one of the above-enumerated questions by the deceased was not literally true, then it would be your duty to find for the defendant."

This is carrying the rule beyond the language of the contract, which only warranted that the answers were true, and did not stipulate that they should be literally true, any more than it provided that they should only be substantially true. The warranty is that the answers are true. The presumption is that the answers are true, and the charge correctly instructs the jury that the burden of proof is upon the defendant company to establish by a preponderance of the evidence the falsity of either one or more of the answers. The issue, therefore, is a question of fact: Are the answers true, or are they not true? A panel of competent jurors do not require that the word "true" should be defined. It is difficult to define it in other terms which will render it more intelligible than it should be and is to a competent jury. There are no degrees in truth. A matter is true or it is not true. All language is more or less relative, and when an issue is stated as clearly as it is when the question

presented is, were these answers made by the applicant true? the work of the jury is not to define the terms, but to weigh the proof; and the instruction, "You are to determine from the preponderance of the evidence whether these answers were true, and, if you find that they were not true, or either of them was not true, you must find for the defendant," is, in our judgment, more correct, without any refinements as to the letter and the substance, which tend. to confuse, rather than enlighten, the minds of laymen.

The plaintiff in error submits that the court erred in refusing to allow the defendant below during the trial of the cause to amend its pleadings so as to allege an additional ground why the policy of insurance sued on was void. The Texas statute provides that all amendments to pleadings must, when court is in session, be filed under leave of the court, upon such terms as the court may prescribe, before the parties announce, ready for trial, and not thereafter. Rev. St. 1895, art. 1188. This statute limits the right which it confers, but does not take away the discretion which, prior to the statute, the courts had to admit amendments in order that justice might be done. In Texas, as elsewhere, the courts sometimes, in the exercise of that discretion, pending the trial permit a party to amend after he has announced ready for trial. In that state the courts of last resort have approved of the action of trial courts in granting leave to amend pending a trial, but we have not been referred to any case in which it has held that the trial court erred in refusing leave to amend after the party had announced ready for trial, and had entered on the trial of the case. The bill of exceptions shows that:

"On the trial of this case, beginning on the 13th day of December, 1898, during the progress of the trial, and after the plaintiff had introduced his testimony in chief and rested, and the. defendant had introduced its testimony and rested, and the plaintiff had introduced his testimony in rebuttal, to wit, late in the afternoon of December 14th, plaintiff's witness Dr. G. B. Fosque testified that he had made an examination of John I. Hassler during the spring of 1897 as a subject for life insurance; that he did not examine him carefully, and did not examine his lungs, but merely made an inspection, taking his family history and his own statements regarding his health; the application being in a company that did not require a careful examination. Upon cross-examination by the defendant's counsel the witness stated that the insurance referred to was for a small amount in the Sun Life Insurance Company, which amount was less than $500, and that the same was granted to him, so the witness was told. The court thereupon adjourned for the next day, and on the 15th day of December, 1898, on the opening of court, and as the plaintiff was about to conclude his testimony in rebuttal, the defendant moved the court to permit it to amend its pleadings to the extent of alleging another ground of forfeiture of the policy sued upon; that in Hassler's application for insurance he was required to answer in what companies and for what amounts he was then insured, giving date of policies, and that he, the said Hassler, answered 'None.' The defendant claimed that it had been surprised by the testimony of the plaintiff's witness Fosque on the preceding afternoon concerning the existence of this prior insurance, which was not disclosed, but suppressed, in the application of Hassler for the policy sued on; whereupon the plaintiff produced to the court the first application of Hassler to the defendant company for insurance, made in August, 1897, addressed to the defendant company, and which had been refused by the company, and returned to its medical examiner, Dr. J. C. J. King, of Waco, Texas, wherein Hassler had stated that he had other insurance in the Sun Life Insurance Company, dated

the 1st of July, 1895. It was also shown that in the proofs of death furnished by the plaintiff, Yoakum, as executor, to the defendant, early in September, 1898, which proofs of death had been before that introduced in evidence in this case by the defendant, the deceased, Hassler, had other insurance, amounting to $220, in the Sun Life Insurance Company, at the time of his death, besides the policy sued on; and it was further shown that the proofs of death had been furnished the defendant company early in September, 1898, and had been in its possession ever since, showing this fact. Thereupon the court refused to allow the defendant to amend its pleadings for the reason that the defendant appeared to be affected with sufficient facts to put it upon full notice of the existence of this prior insurance in time to have availed itself of this point as a defense; failing in which the defendant was guilty of negligence and laches, and was not entitled to amend its pleadings so as to set up a new case of forfeiture at this stage of the trial. It was further shown that the Sun Life Insurance Company had an office in Waco, and had had for several years, and that its agent was C. S. Swinney."

We think the application to amend pending the trial was addressed to the sound discretion of the trial court, the exercise of which in this case, if subject to review, should not be held to be reversible error.

We reserve for consideration later the fourth assignment of error. The fifth assignment is that the court erred in refusing to allow the defendant to prove by the witnesses J. L. Garrett and L. C. Penry, the attorneys for the insurance company, that the witness M. V. Hassler had made statements to them out of court contradictory to those made by her in court. M. V. Hassler is the surviving wife of the insured. She was called as a witness by the executor, and testified only to the death of her husband, and that she was the surviving widow. Thereupon, being tendered the defendant for cross-examination, its counsel asked her, among other things, what was the matter with the deceased at the time of his death, intending to follow up this question with further questions to elicit from her all the facts which were subsequently testified to by her when she was recalled by the defendant as its witness; but the plaintiff objected that the counsel should confine his questions to a strict cross-examination as to the matters which had been inquired about by the plaintiff, which objection the court sustained. When the defendant came to offer its testimony, it called this witness, and she then testified that her husband had to take to his bed in January, 1898; that he had not been coughing before that time, except once in a while; that he was a farmer and gardener, and rented land from Mrs. Earle, onto which he moved in December, 1896; that the only spell he had while on Mrs. Earle's place in 1897 was a little spell during April, which lasted him about a week, and that he was not sick in May and June of that year; that he rented of Mrs. Earle 12 acres in orchard and 12 acres in garden and truck patches; that the rent was payable in part of the produce; that he did not get any advances from Mrs. Earle, or anything in the way of supplies to run the place, and did not mortgage to her two horses and a hack and a wagon for the purpose of getting money to raise a crop there for the year 1897; that she first heard of the $4,000 judgment in favor of Mr. Yoakum against her husband about a year ago, and that she first heard of the will made by her husband naming Yoakum as executor about the time the policy was issued; that her husband owed Yoakum

$4,000 for borrowed money to run his business of farming and gardening while working for Mrs. Earle, and a Mr. Faulkner, from whom he rented land for five or six years before he rented from Mrs. Earle; that she did not remember how much was borrowed in any year, and never heard her husband say how much was borrowed, nor the time when it was borrowed, in any year, and that all the money she ever saw Yoakum give to her husband was $10, during his last illness, a while before he died. The defendant offered to prove by the witnesses Garrett and Penry that Mrs. Earle had stated to them during the month of November, 1898, that she had never heard, until she was told by them, of the existence of the judgment against Hassler in favor of Yoakum for the sum of $4,000; that her husband did not owe Yoakum any borrowed money at all, and did not owe him $4,000, and only owed him a few dollars advanced to him during his last sickness, which was furnished in the nature of supplies long after the issuance of the policy sued on; that she knew nothing about her husband's having made a will naming Yoakum as executor, and providing for the payment of his debts in preference to the gifts and allowances to his wife, and that she should receive only such portion as should be left after the payment of all debts against the estate. To the introduction of this testimony the plaintiff objected for the reason that the defendant, having called Mrs. Hassler as its witness, was precluded from attacking her credibility and from impeaching her by independent statements made out of court; and, further, because it had laid its predicate for such impeachment upon immaterial matter, and was concluded by the answers of the witness. It is stated in the assignment of error that the defendant offered this testimony for the reason that Mrs. Hassler was a hostile witness, interested in the result of the litigation, and virtually a party to the suit, and that the statements made by her out of court were against her own interests, and that the defendant was surprised by her testimony. The objections of the plaintiff were sustained, and the court refused to allow the offered testimony of Garrett and Penry to be introduced. The record does not show that Mrs. Hassler's relation to this case is such that any statements made by her out of court could be used to limit the right of the executor to recover on the policy on which this action was brought. The rules for conducting the examination of witnesses are such as to fully justify the trial court in restricting the defendant in the exercise of its right to cross-examine to matters on which the witness had testified on the direct examination. If the witness had knowledge of other facts tending to support the defendant's case, the court might, to meet the convenience of the witness or of the parties, permit such testimony to be given, on a proper examination by the defendant, at the time the witness was first called, although called by the plaintiff. The better practice, however, where the convenience of the witness and of the parties will permit it, is to restrict the examination by the defendant to the matter which the plaintiff has introduced, and require the defendant, if it so desires, to call the witness as its own when the time is reached for it to introduce evidence in support of its case. It is manifest from the whole tenor of the

testimony drawn from this witness, and from the substance of the testimony offered to be given by the witnesses Garrett and Penry, that the material purpose was to contradict Mrs. Hassler, not in reference to any matter about which she had testified at the instance of the plaintiff, because it was not in dispute that the insured was dead, and that this witness is his widow. As her testimony could not be used as declarations of a party against interest to limit or defeat the recovery by the executor, it is difficult to see what purpose could be served by permitting the attorneys for the defendant to testify that when they had approached her several months before on the subject of this litigation, to which they now say she is an adverse party, she had then answered in a different manner from that in which she answered their questions when called as a witness in open court. It is manifest from the undisputed facts in this record that the insured was indebted to Yoakum to the extent of the premium advanced; and, as the case is here presented, it is wholly immaterial to the defendant whether the insured was or was not further indebted to Yoakum. All the testimony on that subject, so far as it affects this assignment, was immaterial, and the second objection made by the plaintiff was well taken. 3 Jones, Ev. §§ 827, 855, 857, 858; 1 Greenl. Ev. (14th Ed.) § 462.

The sixth assignment is that "the court erred in its charge to the jury in limiting the period in which Hassler had stated that he was then and had been in good health to the date of said application." Further on it is said in this assignment that "the charge of the court in making the limitation herein complained of is shown in assignment of error No. 2, above." The most critical examination that we have been able to make of the assignment No. 2 does not disclose to us any such express limitation. It may be that there is an omission in the general charge, but, if so, it is not pointed out either in this assignment or in assignment No. 2. The record nowhere discloses that any exception was taken to the charge on this ground, or bill of exception reserved, or counter instruction requested. Moreover, there is nothing in the testimony brought up in the different bills of exception tending to show that Hassler was not in as good health when he received the policy as he was when he made the application. The entire contention of the defense in the case was that the answers made in the application were false. The issue on this defense was fairly submitted to the jury, and found against the defendant.

The fourth assignment is that "the court erred in rendering judgment for 12 per cent. damages upon $5,000, and also for $750 for attorney's fees, for the reason that such charges constitute a penalty upon the defendant for defending this litigation, and discriminate against it, and are consequently contrary to law and unconstitutional." The circuit court instructed the jury that the plaintiff sued the defendant for statutory damages and all reasonable attorney's fees for the prosecution and collection of the loss alleged to have accrued to the plaintiff, under the provisions of the statute of the state of Texas relative to and controlling the operation of life insurance companies in the state; and that, if the jury found for the

plaintiff on the issues of fact as presented, he would be entitled to recover, and the jury should find by their verdict 12 per cent. damages on the amount of the loss, together with all reasonable attorney's fees for the prosecution of the suit. The statute referred to in the charge of the court, as originally passed on May 2, 1874, is the ninth section of an act to regulate life and health insurance companies and all associations, partnerships, or individuals doing life and health insurance business, incorporated within or without the state of Texas. As then passed, the language was:

"The several foreign life insurance companies, and those incorporated out of this state, in all cases where a loss occurs, and when they refuse to pay the same within the time specified in the policy, shall be liable to pay the holder of said policy, in addition to the loss, not more than twelve per cent on the liability of said company for said loss; also all reasonable attorney's fees for the prosecution of the case against said company; and should any such company fail to pay off and satisfy any execution that may lawfully issue on any final judgment against said company within thirty days after notification of the issuance thereof, then and in that event the certificate issued to said company shall immediately become null and void, and said insurance company shall be prohibited from transacting any business in this state until said execution shall be fully satisfied and discharged." 2 Pasch. Dig. art. 7116.

The foregoing section was somewhat modified, evidently to meet decisions construing the fourteenth amendment to the constitution of the United States, and carried forward into the Revised Statutes of Texas of 1879, where it appears in articles 2953 and 2954, c. 3, of title 53, relating to the general subject of insurance, in the precise language in which it now appears in the Revised Statutes of Texas of 1895, in articles 3071 and 3072, c. 3, of title 58, on the subject of insurance, as follows:

"Art. 3071. (2953) In all cases where a loss occurs and the life or health insurance company liable therefor shall fail to pay the same within the time specified in the policy, after demand made therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve per cent damages on the amount of such loss, together with all reasonable attorney's fees for the prosecution and collection of such loss.

"Art. 3072. (2954) Should any life or health insurance company fail to pay off and satisfy any execution that may lawfully issue on any final judgment against said company within thirty days after the officer holding such execution has demanded payment therefor from any officer, agent or attorney of such company in this state or out of it, such officer shall immediately certify such demand and failure to the commissioner of insurance, and thereupon the commissioner shall forthwith declare null and void the certificate of authority issued by him to such company, and such company shall be prohibited from transacting any business in this state until said execution shall be fully satisfied and discharged, and until such commissioner shall renew his certificate of authority to such company."

The validity of article 3071 has been several times drawn in question in the supreme court and in the courts of civil appeals of Texas, and had been uniformly sustained until the rendition of the judgment on rehearing by the court of civil appeals for the Second district in the case of Insurance Co. v. Smith, 41 S. W. 684, 687. In that case the trial court had rendered judgment in favor of the policy holder for the statutory damages and attorney's fee, and the court of civil appeals announced its decision affirming the judgment, but said in its opinion:

"We would be inclined, however, to hold, upon the authority of the decision of the supreme court of the United States in the case of Railroad Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666, that the attorney's fees and penalty allowed in the judgment of the lower court, as provided for in article 3071, Rev. St. Tex., could not be recovered; but, in view of the recent action of the supreme court of Texas in refusing a writ of error in the case of Casualty Co. v. Allibone, 90 Tex. 660, 40 S. W. 399, we follow the authority of the latter court, and in all things affirm the judgment herein."

The courts of civil appeals of Texas consist of three judges. On a rehearing in the foregoing case a majority of the court reversed its former decision. After referring to their former opinion, they use this language:

"We now think, however, that there can be no room to doubt that the said article is unconstitutional, and contrary to and violative of section 1 of the fourteenth amendment to the constitution, especially when read by the light of the case of Railway Co. v. Ellis. * * * We think the cases of Insurance Co. v. Chowning, 86 Tex. 654, 26 S. W. 982, 24 L. R. A. 504; Insurance Co. v. Walden (Tex. Civ. App.) 26 S. W. 1012; Casualty Co. v. Allibone (Tex. Civ. App.) 39 S. W. 632; and Id., 90 Tex. 660, 40 S. W. 399,—were all erroneously decided, and they are overruled."

Mr. Justice Hunter dissented from the decision and opinion of the majority as rendered on this rehearing, and in his dissenting opinion, referring to a message of the governor of Texas to the legislature, and to the statistics of the commissioner of insurance, he says:

" 'Life insurance companies principally chartered by and domiciled in the state of New York have for years done a large business in this state [Texas]. The excess of premiums over losses paid these companies by the people of Texas for the year 1895 was $2,471,192. The premiums which our people paid three New York companies for the past ten years amounted to $18,644,124.85, and the policies which they paid aggregated only $4,947,659.51.' The appellant in this case, a New York corporation, commenced doing business in this state [Texas] in 1881, and up to the close of business in 1895 had collected from our people in premiums $6,349,979.68, while during the same period it paid back to us in losses only $1,877,941.90. The same report shows that the Equitable Life Assurance Society of New York commenced in 1876, and had collected $6,404,256.21, and had only paid back $2,133,304; while the Mutual Life Insurance Company of New York commenced in 1880, had collected $7,351,743.80, and had paid back in losses only $1,648,546.33, or less than 22½ per cent. of what it had collected. The same report shows that these three New York corporations—two without any capital stock, and the other (the Equitable) with only $100,000 capital stock—had accumulated assets aggregating $548,253,211.55, and their aggregate surplus over and above all liabilities had grown in 1895 to the enormous sum of $101,804,289.23. There were 20 other life insurance companies doing business in this state in 1895 upon the same plan, rates, and methods, and withdrawing from the people their resources upon about the same ratio. It is a well-known fact that a corporation known as the 'Louisiana Lottery Company,' lately driven from the shores of this country because of its demoralizing methods of doing business, and of the vast sums of money it drained from the people monthly and annually, sold tickets to the people of the value of $3,000,000 monthly, and paid back to them in cash prizes $1,500,000. In other words, it collected $2, and paid back $1. Yet these great moral corporations, by their equally alluring schemes, collect from our people $4 and pay back only a little over $1, and often then, as the records of the courts of the state will show, at the end of a long, tedious, and expensive lawsuit. If the financial prosperity and welfare of the people of the state may be taken into consideration by our legislature, and, in the exercise of the police powers of the state, sound public policy would authorize discriminating legislation against lottery companies, because, among other reasons, of their methods of doing business, and of the

great amounts of money drained annually from our people, and carried away to glut the coffers of greed and avarice, then why should these great money cormorants of New York escape? It seems to me that the legislature of Texas, in the exercise of this great residuum of power still left in the people of the states, had the right to enact the statute in question, discriminating against this character of business, and that good reasons, founded in sound state policy, existed therefor; and that, therefore, the statute is not in contravention of the fourteenth amendment to the constitution of the United States, but is valid and binding as part of the contract sued on in this case, and that the appellee ought to recover the penalty and attorney's fees provided for therein, the same as if they were named in the face of the policy."

Without concerning ourselves with any question as to the good reasons, founded in sound state policy, for the passage of the act in question, and without adopting Judge Hunter's nervous rhetoric, we may derive instruction from the facts which he recites. In a recent case the supreme court of the United States passed on the constitutionality of a somewhat similar statute of Kansas:

"An act relating to the liability of railroads for damages by fire.

"Section 1. Be it enacted by the legislature of the state of Kansas: That in all actions against any railway company organized or doing business in this state, for damages by fire, caused by the operating of said railroad, it shall be only necessary for the plaintiff in said action to establish the fact that said fire complained of was caused by the operating of said railroad, and the amount of his damages (which proof shall be prima facie evidence of negligence on the part of said railroad): provided, that in estimating the damages under this act, the contributory negligence of the plaintiff shall be taken into consideration.

"Sec. 2. In all actions commenced under this act, if the plaintiff shall recover, there shall be allowed him by the court a reasonable attorney's fee, which shall become a part of the judgment."

Sess. Laws 1885, p. 258, c. 155.

We quote at some length different portions of the opinion of the court in this case:

"It is contended that it [the Kansas act] is in conflict with the fourteenth amendment to the federal constitution, and this contention was distinctly ruled upon by the supreme court of the state adversely to the railroad company. In support of this contention great reliance is placed upon Railroad Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666. In that case a statute of Texas allowing an attorney's fee to the plaintiffs in actions against railroad corporations on claims, not exceeding in amount $50, for personal services rendered or labor done, or for damages, or for overcharges on freight, or for stock killed or injured, was adjudged unconstitutional. It was held to be simply a statute imposing a penalty on railroad corporations for failing to pay certain debts, and not one to enforce compliance with any police regulations. It was so regarded by the supreme court of the state, and its construction was accepted in this court as correct. While the right to classify was conceded, it was said that such classification must be based upon some difference bearing a reasonable and just relation to the act in respect to which the classification is attempted; that no mere arbitrary selection can ever be justified by calling it classification. And there is no good reason why railroad corporations alone should be punished for not paying their debts. Compelling the payment of debts is not a police regulation. We see no reason to change the views then expressed, and, if the statute before us were the counterpart of that, we should be content to refer to that case as conclusive. But, while there is a similarity, yet there are important differences, and differences which, in our judgment, compel an opposite conclusion. The purpose of this statute is not to compel the payment of debts, but to secure the utmost care on the part of railroad companies to prevent the escape of fire from their moving trains. This is obvious from the fact that liability for damages by fire is not

cast upon such corporations in all cases, but only in those in which the fire is 'caused by the operating' of the road. It is true that no special act of precaution was required of the railroad companies, failure to do which was to be visited with this penalty, so that it is not precisely like the statutes imposing double damages for stock killed where there has been a failure to fence. Railway Co. v. Humes, 115 U. S. 512, 6 Sup. Ct. 110, 29 L. Ed. 463. And yet its purpose is not different. Its monition to the railroads is not, 'Pay your debts without suit, or you will, in addition, have to pay attorney's fees:' but rather, 'See to it that no fire escapes from your locomotives, for, if it does, you will be liable, not merely for the damage it causes, but also for the reasonable attorney's fees of the owner of the property injured or destroyed.' It has been frequently before the supreme court of Kansas, has always been so interpreted by that court, and its validity sustained on that ground. * * * In 1887 the legislature of the state of Missouri felt constrained to pass an act making every railroad corporation responsible in damages for all property destroyed by fire communicated, directly or indirectly, from its engines, and giving the corporation an insurable interest in the property along its road. This statute was, after a full examination of all the authorities, held by this court a valid exercise of the legislative power. Railroad Co. v. Mathews, 165 U. S. 1, 17 Sup. Ct. 243, 41 L. Ed. 611. So, when the legislature of Kansas made a classification, and included in one class all corporations engaged in this business of peculiar hazard, it did so upon a difference having a reasonable relation to the object sought to be accomplished, to wit, the securing of protection of property from damage or destruction by fire. * * * As individuals, we may think it better that the legislature prescribe the specific duties which the corporations must perform. We may think it better that the legislation should be like that of Missouri, prescribing an absolute liability, instead of that of Kansas, making the fact of fire prima facie evidence of negligence. But, clearly, as a court, we may not interpose our personal views as to the wisdom or policy of either form of legislation. It cannot be too often said that forms are matters of legislative consideration; results and power only are to be considered by the courts.

"Many cases have been before this court involving the power of state legislatures to impose special duties or liabilities upon individuals and corporations, or classes of them, and, while the principles of separation between those cases which have been adjudged to be within the power of the legislature and those beyond its power are not difficult of comprehension or statement, yet their application often becomes very troublesome, especially when a case is near to the dividing line. It is easy to distinguish between the full light of day and the darkness of midnight, but often very difficult to determine whether a given moment in the twilight hour is before or after that in which the light predominates over the darkness. The equal protection of the laws which is guarantied by the fourteenth amendment does not forbid classification. That has been asserted in the strongest language. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923. In that case, after, in general terms, declaring that the fourteenth amendment was designed to secure the equal protection of the laws, the court added (pages 31, 32, 113 U. S., page 359, 5 Sup. Ct., and page 925, 28 L. Ed.): 'But neither the amendment,—broad and comprehensive as it is,—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its "police power," to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts,—such as for draining marshes and irrigating arid plains. Special burdens are often necessary for general benefits,—for supplying water, preventing fires, lighting districts, cleaning streets, opening parks, and many other objects. Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all per-

sons and property, under the same circumstances and conditions. Class leg-
islation, discriminating against some and favoring others, is prohibited; but
legislation which, in carrying out a public purpose, is limited in its applica-
tion, if within the sphere of its operation it affects alike all persons similarly
situated, is not within the amendment.' This declaration has, in various lan-
guage, been often repeated, and the power of classification upheld, whenever
such classification proceeds upon any difference which has a reasonable rela-
tion to the object sought to be accomplished. It is also clear that the legis-
lature (which has power in advance to determine what rights, privileges, and
duties it will give to and impose upon a corporation which it is creating) has,
under the generally reserved right to alter, amend, or repeal the charter, power
to impose new duties and new liabilities upon such artificial entities of its
creation. Railroad Co. v. Paul, 173 U. S. 404, 19 Sup. Ct. 419, 43 L. Ed. 746.
* * * Our conclusion in respect to this statute is that, for the reasons above
stated, giving full force to its purpose as declared by the supreme court of Kan-
sas, to the presumption which attaches to the action of a legislature that it has
full knowledge of the conditions within the state, and intends no arbitrary
selection or punishment, but simply seeks to subserve the general interest of
the public, it must be sustained, and the judgment of the supreme court of
Kansas is affirmed. Railroad Co. v. Matthews, 19 Sup. Ct. 609–613, 43 L. Ed.
913."

The record before us does not disclose in full the policy sued on,
the application therefor, and the report of the medical examiner.
The answer says that the policy of insurance sued on was based upon
a written and printed application therefor, wherein the applicant was
required to answer, etc., which phrase "required to answer" is re-
peated from time to time as the several breaches of warranty are
counted on. From this it appears, as we also know from common
knowledge, that the application, the report of the medical examiner,
and the policy are all in the form prescribed by the plaintiff in
error. There is no statutory regulation in Texas to control or mod-
erate the companies in propounding such forms, and it is safe to
assume that the numerous companies (including the plaintiff in er-
ror) doing business in that state substantially follow classic prece-
dents, and attain the perfection of such literature as we find it de-
scribed in Grattan v. Insurance Co., 80 N. Y. 290, wherein it is said:

"The application covers more than two pages of the printed case. It con-
tains questions numbered from one to seven, most of them divided into parts
distinguished by letters of the alphabet from A to F, inclusive, and subclauses
characterized by neither figure nor letter, but separated from the context by
blank spaces, calling for twenty-eight answers, while the medical examiner's
certificate annexed thereto covers more than three pages, and calls for upwards
of one hundred answers, to be signed also by the applicant for the insurance;
and, as given, purport to be transcripts of his answers to the medical ex-
aminer."

In the case before us the answer avers:

"That all of the statements and answers made by said Hassler in reply to
the questions which he answered in said application, as hereinbefore stated,
were material, and that all the terms of said application he consented and
agreed should be material, and that they were warranties, and that they were
true, and complete, and that they were made as a basis for the issuing of the
policy then applied for, and which is here now sued on."

At common law the warranty of the truth of the answer to a
specific inquiry in the application implies the agreement that the
subject-matter of the question and answer is to be regarded as ma-
terial, and that an untrue answer thus warranted avoids the policy,

whether the answer be made in good faith or not. Anderson v. Fitzgerald, 4 H. L. Cas. 484. The foregoing rule of the common law in its harshest strictness appears to retain its force in Texas. We quote from a recent decision in that state:

"In the application, which is made a part of the policy, the assured stated in writing that his place of residence was Kyle, Hays county, Texas. The evidence beyond dispute establishes the fact that at the time of his application, before, or since, he did not reside at Kyle, but was a farmer, residing in the country about 12 miles from Kyle. [We note that it does not appear in the opinion that the applicant did not reside in Hays county, and that Kyle was not his post-office address.] The application in unequivocal terms warrants the literal truth of the statements made therein, and declares that the knowledge by an agent that any statement made by the assured was false shall not, in any manner, affect the right of the company to declare the policy void on account of the breach of the warranty; and the policy expressly provides that any false statement shall avoid the contract of insurance. It results from these facts that the assured falsely stated his place of residence, and, in accordance with the well-settled rule of law upon the question, this necessarily avoids the policy, although the false statement may not relate to a matter that is material, and although the risk may not be increased by reason of the fact that the applicant resides elsewhere than as stated in the application. When once it is ascertained that the statement is a warranty, and that it is false, and the policy expressly provides for a forfeiture in that event, the contract must be so enforced, although it concerns a matter of slight importance, and may not in any manner seriously affect the risk. In this case it is not insisted that the agent who accepted the application had notice of the falsity of the statement of the assured in this respect when it was made; but, assuming that under the facts he may have known that it was false, still the terms of the policy settle this question. The parties to the contract of insurance had the right to make, as a part of their agreement, the condition that the knowledge of the agent of the falsity of the answers should not preclude or estop the company. This was one of the express provisions of the policy, and is as much binding upon the assured as any other of its terms. Fitzmaurice v. Insurance Co., 81 Tex. 61, 19 S. W. 301." Hutchison v. Insurance Co. (Tex. Civ. App.) 39 S. W. 325.

In many of the states the legislature has interfered with rational regulation on this subject, and has provided substantially as shown in the act of the legislature of Pennsylvania passed June 23, 1885:

"That whenever the application for a policy of life insurance contains a warranty of the truth of the answers therein contained, no misrepresentation or untrue statement in such application, made in good faith by the applicant, shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application, unless such misrepresentation or untrue statement relate to some matter material to the risk."

Referring to this statute, the supreme court of Pennsylvania say:

"This act has effected a change in life insurance contracts,—a much-needed change so far as some companies are concerned. The questions of materiality and good faith are ordinarily questions of fact, and therefore are for the jury. They were certainly so in this case. * * * The evident purpose of this legislation was to strike down in this class of cases literal warranties so far as they may be resorted to for the disreputable purpose of enforcing actually immaterial matters. It provides a rule of construction for the purpose of preventing injustice, and it is as much the duty of courts to enforce such rules as it is to administer the statute of frauds and perjuries." Hermany v. Association, 151 Pa. St. 17, 24 Atl. 1064.

The warranties counted on in the defense in the case we are considering all relate to the state of physical soundness and health of the applicant, and are material to the risk. Touching these, four

physicians who had attended the applicant in a professional ca-pacity were called to testify. It is a hoary maxim that doctors will differ. One of the physicians called in this case testified that he made a careful examination of the applicant in October, 1897, and found "that he was in the third stage of consumption, and had a cavity in his lung as big as your fist." The three other physicians each testified substantially that they had attended the applicant in a professional capacity at different times during the year 1897 (early spring, 28th of September, latter part of November), had examined his lungs, and found that they were sound and healthy. In the state of New York it is provided by statute that:

"A person duly authorized to practice physic or surgery shall not be allowed to disclose any information which he acquired in attending a patient in a pro-fessional capacity, and which was necessary to enable him to act in that capacity." Code Civ. Proc. § 834.

The Code provides in a subsequent section (836) for the waiver by certain parties of the bar of this privilege, which waiver must be made in open court on the trial of the action or proceeding, and "a paper executed by a party prior to the trial, providing for such waiver, shall be insufficient as such a waiver. But the attorneys for the re-spective parties may, prior to the trial, stipulate for such waiver, and the same shall be sufficient therefor." Amendment of section 836, to take effect 1st of September, 1899 (Laws 1899, c. 53). This statute is discussed in numerous decisions by the New York courts, of which we cite only a few: Edington v. Insurance Co., 67 N. Y. 185; Dilleber v. Insurance Co., 69 N. Y. 256; Cahen v. Insurance Co., Id. 300; Grattan v. Insurance Co., 80 N. Y. 281; Id., 92 N. Y. 274; Nelson v. Village of Oneida, 156 N. Y. 219, 50 N. E. 802. It is also fully discussed by the supreme court of the United States in Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 5 Sup. Ct. 119, 28 L. Ed. 708. Somewhat similar provisions appear to have been made in very many of the American states. See "Privileged Communications," 19 Am. & Eng. Enc. Law, pp. 147, 148, note 5. In the case of Railroad Co. v. Ellis, supra, Mr. Justice Gray, with whom concurred Mr. Chief Justice Fuller and Mr. Justice White, ex-pressed regret—

"That so important a precedent as this case may afford, for interference by the national judiciary with the legislation of the several states on little ques-tions of costs, should be established upon argument ex parte in behalf of the railroad corporation, without any argument for the original plaintiff."

He added:

"But it is hardly surprising that the owner of a claim for fifty dollars, hav-ing been compelled to follow up, through all the courts of the state, the con-test over this ten-dollar fee, should at last have become discouraged, and un-willing to undergo the expense of employing counsel to maintain his rights before this court."

In the case of Casualty Co. v. Allibone, 90 Tex. 660, 40 S. W. 399, we note this language in the opening of the opinion by the chief justice:

"Since the filing of the application for the writ of error in this case, counsel for the appellee, desiring, as he says, to eliminate the federal questions involved,

has offered to remit in this court so much of the recovery as was given for attorney's fees and damages under the statute."

The court held that the remittitur could not be allowed in the supreme court. The decision and judgment of the trial court and of the court of civil appeals were affirmed, and, as the case has not appeared in the supreme court of the United States, it is safe to assume that counsel for the appellee made the remittitur out of court to eliminate the federal question, and thus obtain the collection of the principal sum. That suit was by the widow of the insured. Her husband's death occurred on the 23d day of August, 1891. Proof of death was made formally on February 29, 1892. Suit was filed by the widow on the policy in the United States circuit court at Dallas on the 4th of May, 1892. That suit was dismissed for want of jurisdiction in February, 1893, and suit was immediately brought on the policy (February 3, 1893) in the state court, in which court the defendant, the insurance company, obtained judgment on its plea of limitation. This judgment was reversed on appeal by the court of civil appeals. 32 S. W. 569. On a second trial the widow recovered judgment. The defendant insurance company thereupon appealed to the court of civil appeals, and the judgment was affirmed. 39 S. W. 632. The insurance company then applied to the supreme court for a writ of error, which was granted, and at the hearing thereon the case was decided in favor of the policy holder, and the judgment of the lower courts affirmed April 29, 1897, or nearly six years after the death of the insured.

In the quotation which we have made from the opinion of Judge Hunter in the Smith Case we have seen that he alludes to the fact that in Texas money is received from the insurance companies in payment of losses to the extent of only a small per cent. of the premiums received by them, and "often, then, as the records of the courts of the state will show, at the end of a long, tedious, and expensive lawsuit." It must be manifest to the most casual observation that the parties to these insurance contracts and to such a controversy are unequally matched. It is human nature and human experience that the stronger will use his strength. He may piously declare his benevolent intentions, and disclaim any purpose to profit by his power, but he will use it none the less. Without the aid of a legal fiction, we cannot say or think that the minds of these contracting parties do or can ever meet. One is a mere legislative thought, a legal, artificial, imaginary entity, invisible, endowed with immortality, and almost superhuman powers of organization and delegated activities, and infinite capacity for expansion and the receiving of tribute. It can act only through agents. For the exercise of its controlling powers, it is able to secure, and constantly retain, the highest order of talent in every department of its organization. In a world-wide field of minute operations these governing agents, wherever located, must, of necessity, be practically unapproachable by the vast concourse of parties with whom the invisible principal deals. A hierarchy results. Of this hierarchy the lowest rank, in prodigious swarm, fill the land. The scope of their agency is limited with marvelous skill. Armed with longer and shorter

catechisms, and a form of covenant devised with consummate ingenuity, one of these inspired special agents finds the Hays county farmer at his plow tail, 12 miles from Kyle (probably his nearest railroad town, most accessible post office, and the home of the agent), proclaims his gospel, and receives the novice into the host of the contributing elect. A brother of like degree finds the horticultural laborer in McLennan county, engaged in raising on rented land vegetables, berries, and fruits, and peddling the same to families in the county town. He learns that this market, garden, and truck farmer wants to get his life insured for the benefit of his wife. These parties meet, and exchange views on the subject. With the aid of a medical examiner, appointed by the insurance company, the special agent opens and explains the questions in the catechisms, and reduces to writing in due form (as these experts explain and declare) the required answers,—128, more or less,—each of which answers as thus written by the agent and the medical examiner this unlettered novice is required to adopt and warrant to be true, without any regard to the answers as actually spoken by him or to the facts patent to the sight of these special agents, whose auditory and optic nerves have been so paralyzed by the limitations on the scope of the agency that they do not connect with the mind of the mystic principal. These paralyzed agents are the only human organs through which the insurer corporation expresses itself to the mind of the insured. Where the strict literal warranty doctrine obtains, the wonder is not that a breach of a contract, thus written and construed, can often be established, but that such a contract so construed can ever be enforced after the death, and hence without the testimony of the insured.

The subject is a large one. It is one of peculiarly vital public interest. It challenges legislative attention. The foregoing examples, which we have taken from the record in this case and from the Texas Reports, are by no means exceptional in that state, but are representative. It seems to us that the state legislation drawn in question by this assignment is not in conflict with the fourteenth amendment to, or any other provision of, the constitution. It is not simply a statute imposing a penalty on life or health insurance companies for failing to pay certain debts, but is one to enforce reasonable regulations and conditions on which such companies are permitted to do business in Texas. The purpose of this statute is not to compel the payment of debts. Life and health insurance companies do not usually neglect or defer the payment of their admitted debts. They generally advertise themselves as having a large accumulation of surplus revenue, and as being ready to pay, as soon as it matures, whatever debt they owe. The obvious purpose of the act is to secure a righteous degree of care in writing policies of insurance, so that the immortal insurer will not receive premiums from an honest recipient of one of its policies which does not bind it to meet the loss that he bargains it shall meet, and in consideration for which he parts with his money while he is alive and able to make earnings, that he may, to the extent stipulated, protect his family or his creditors against the contingency of his death, which must

occur. To enforce the exercise of this righteous care on the part of the very strong in contracting with the weaker and less learned, and in conducting humanely this peculiar business that reaches so often across the graves of the insured to the homes of afflicted dependents, so that the insurers will not receive premiums from honest parties whom the contracts as written do not insure, would seem to be within the legislative power. The classification here involved is, therefore, not arbitrary, but has reasonable relation to the peculiar features of the business to which it applies. It does not discriminate against some and favor others, but, though limited in its application, does, within the sphere of its operation, affect alike all persons similarly situated. It seeks to subserve the general interest of the public. It must be sustained. Whatever may be the sound conclusion as to the unqualified validity of this Texas statute, we hold that the fourth assignment of error in this case is not well taken, on the ground that the state has the right to prescribe the terms upon which foreign corporations may do business therein. "Insurance companies established by charter from one state have no natural right to carry on business in any other state, and permission to do so is a privilege for which the payment of a substantial sum as licensee may be required." Tied. Police Power, p. 281. As articles 3071 and 3072, c. 3, tit. 58, Rev. St. Tex., were in force at the time the Yoakum policy was written, those provisions were assented to by the contracting parties, and were written into the contract.

The judgment of the circuit court is affirmed.