NIAGARA FIRE INS. CO. et al. v. CORNELL, State Auditor, et al.

(Circuit Court, D. Nebraska. September 23, 1901.)

1. FOREIGN CORPORATIONS—STATE REGULATION—STANDING TO CONTEST—VALIDITY OF STATUTE.

While foreign insurance companies can enter a state to do business only by permission of the state, and subject to such regulations and conditions as it may see fit to impose, yet, where they have complied with all such conditions, and under license from the state have expended money in establishing agencies and in advertising and building up a business, they have the right to challenge the validity of statutes subsequently enacted which affect their business and interests equally with those of domestic companies.

2. INJUNCTION—SUIT TO RESTRAIN ENFORCEMENT OF STATUTE.

In a suit against officers of a state to enjoin them from enforcing legislative acts as required by their provisions on the ground of their invalid-

ity, a denial by the defendants of an intention to enforce such acts, coupled with a denial of their invalidity, constitutes no defense and raises no issue.

3. STATUTES—CONSTITUTIONALITY—VESTING JUDICIAL POWERS IN EXECUTIVE OFFICER.

A statute is not invalid, as in violation of a constitutional provision vesting all the judicial powers of the state in the courts, because it provides that charges of violation of its provisions shall be heard and determined in the first instance by an executive officer, where it gives a right of appeal to the courts.

4. EQUITY JURISDICTION—ADEQUATE REMEDY AT LAW—FEDERAL COURTS.

The fact that a complainant has a plain, speedy, and adequate remedy at law in the state courts does not exclude the jurisdiction of a federal court of equity, where the requisite facts exist to give such court jurisdiction of the parties and the subject-matter, and a proper case for equitable relief is shown.

5. STATUTES—DETERMINING CONSTITUTIONALITY—QUESTIONS OF DOUBT.

A trial court will not declare a state statute regulating the business of insurance invalid because of a provision subjecting insurance companies to the payment of attorney's fees for its violation where the company is unsuccessful, but denying them the recovery of fees if successful, as in violation of their constitutional right to the equal protection of the laws, where the question, under the decisions of the appellate federal courts, is doubtful.

6. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—NEBRASKA STATUTE REGULATING INSURANCE.

Act Neb. 1897 (Laws 1897, c. 81), to prevent combinations between fire insurance companies, which, among other things, declares void all agreements by or between such companies relating to the amount of commissions to be allowed agents for procuring insurance, or the manner of transacting the business of fire insurance, is void as a regulation not within the police powers of the state, and as in violation of the constitution of the United States, in that it deprives insurance companies of the equal protection of the laws in the right to make and enforce contracts.

7. SAME—NEBRASKA ANTI-TRUST ACT.

Laws Neb. 1897, c. 79, defining trusts, and declaring them illegal, and all agreements in relation thereto void, and imposing penalties for its violation, makes any combination of capital, skill, or acts, by which persons seek to fix the price of any article, commodity, use, or merchandise, with intent to prevent others in a like business or occupation from conducting the business or occupation, a trust. It declares illegal and void any agreement to fix the price of any article or commodity, or to limit the production of any commodity, or to prevent competition in insurance, or in the making, transportation, or sale, or purchase of any article, and makes all persons entering into such agreements conspirators, and punishable as such. It provides that the charters of domestic corporations shall be forfeited, and foreign corporations excluded from the state, for a violation of its provisions, and makes it the duty of the law officers of the state to institute actions for its violation, in which, if the action is successful, the defendant is taxed with an attorney's fee, but is not allowed an attorney's fee if the action is unsuccessful, and the same provision is made in regard to suits by private persons to recover damages for injury to their business, property, or employment by reason of its violation. It expressly excepts from its provisions all assemblies and associations of working men, and provides that "there is hereby reserved to them all the rights and privileges now accorded them by law." Held, that such act, in its general scope, exceeds the powers of the state, and is unconstitutional and void, as depriving persons of their liberty in violation of the federal constitution, which includes not merely liberty of the person, but liberty to make and enforce contracts, that being an institutional and fundamental right

110 F.—52

of the citizen in the United States; that it also, by excepting labor organizations from its provisions, denies the equal protection of the laws to all persons not members of such organizations.

In Equity. Suit to enjoin the enforcement of state statutes alleged to be in violation of the constitution of the United States.

J. M. Woolworth and W. D. McHugh, for complainants.

F. N. Prout, Atty. Gen., and Norris Brown, Asst. Atty. Gen., for respondents.

McPHERSON, District Judge. A number of fire insurance companies, corporations organized and existing under the laws of states of the United States other than the state of Nebraska, are complainants herein. John F. Corneil, auditor of Nebraska, C. J. Smythe, attorney general, and Howard H. Baldridge, county attorney of Douglas county, are respondents. So far as I deem important, waiving allegations conferring jurisdiction and allegations more or less technical, the recitals of complainants' bill in equity in substance are as follows: Nearly 20 years ago each of complainants made application to the state auditor of Nebraska for license to transact the business of fire insurance in the state, making the showing as to solvency, its character and methods of doing business, and in all respects complying with the requirements of the Nebraska laws relating to foreign insurance companies, including the payment of large sums of moneys to the state; all of which has been done each and every year, and each and all of said exactions and burdens it is now and ever will be ready and willing to comply with and bear. During all of these years it has, by reason of such license, and the many renewals thereof, gone to very large expense in advertising, establishing offices and agencies to properly and successfully carry on its business in the state. The bill then recites at much length historical facts, as claimed, pertaining to the insurance business, by which it appears that until some years ago the business of fire insurance was mere guesswork, and akin to gambling, for the reason that neither the insured nor insurer, nor any one else, knew the cost or value of a certain risk. Then it was that men of great skill and learning and experience were employed to fix the price or cost of insurance of the innumerable kinds of risks. And it is alleged that several years ago the complainants, and a large number of other insurance companies doing business in Nebraska, employed one Hartman, an expert of high standing, to fix the fair and reasonable rates for the various risks, physical and moral, and that the companies would be bound, by agreement, to do business only in accordance with the rates thus fixed by Hartman. Business was so done by agreement in Nebraska, with Hartman's help, until the legislation of which complaint is now made. It is also alleged that the Nebraska legislature, in 1897, passed two statutes, one known as "Senate File No. 330" and the other as "Senate File No. 2," both approved April 15, 1897. No 330 is with reference to "Trusts," defining the same, providing means for their suppression, and provides for punishment for a violation of the statute. It specifically refers to fire insurance companies, and in the definition of a trust it recites that a combination

of capital, skill, or acts by persons with the intent to prevent competition in fire insurance, or by which they shall in any manner establish or settle the price of fire insurance, with the intent to prevent free competition, is in violation of the statute. The other statute is likewise to prevent combinations in matters of fire insurance, and provides penalties for its violations. It is the duty of the auditor, the attorney general, and the several county attorneys to enforce these statutes. Since the passage of these statutes, the companies, including complainants, still get information from the said Hartman as to risks, their classification, their cost or worth, and so on. But it is alleged that Hartman's conclusions, while generally observed, are not always followed, each company acting as it deems wise, and often ignoring his recommendations. It is also alleged that, unless restrained, defendants will seek to enforce these statutes, to the great annoyance, detriment, and damage of the companies. And complainants insist that the statutes for various reasons are in conflict with both the state and federal constitutions. An injunction is prayed for, restraining the defendants, their successors in office, and the various county attorneys from enforcing, as against any of complainants, either of the statutes, or any of their void provisions. Supplemental bills have been filed, showing that annually since the bill was filed each of complainants has made a proper showing to the auditor, paid the money necessary to enable it to do business in Nebraska, and has received a license therefor. Other important allegations are made, which will be noticed later in this opinion. A restraining order was issued by Judge Munger. The answers to the bill and supplemental bills were filed by Mr. Smythe, the then attorney general. He tendered but three issues: (a) A denial of the unconstitutionality of either of said statutes; (b) denies that either he or the auditor, or any county attorney, intends to attack either of the complainants because of a violation of either of the statutes in question; (c) allegations that complainants are doing business in Nebraska by mere sufferance. On the issues thus raised the case has been tried.

1. Neither the first nor third defense raises any question of fact; and in my judgment the second defense neither raises a question of fact that need be decided, nor has it any merit. The showing both by the allegations of the bill not put in issue and the proofs is to the effect that by legislation for a great many years in force, and still in force, in Nebraska, foreign insurance companies were invited to go into Nebraska and do a fire insurance business. This was done, no doubt, partly by reason of comity to other states, but no doubt largely to enable the citizens of the state to have competition generally, and particularly as to large risks in the cities. The companies went into the state, and for many years paid large sums to the state, and additional large sums in advertisements, establishing offices, agencies, and other necessary expenses. The present attorney general, in his argument, strongly and with much ability and force urges for my consideration the case in the United States supreme court of Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357. I agree with him that that case and many other like cases hold—to all of

which I agree—that foreign insurance companies cannot do business in Nebraska excepting by and with the consent of the state of Nebraska. To that effect the law is well settled. If the state of Nebraska by legislation makes it more onerous for foreign insurance companies, there can be no doubt about the validity of such legislation. Their license fees can be increased. Their local agents can be required to pay fees. The laws can be made more rigorous as to suits brought against them. They can be required to name in the state or in every county a resident attorney upon whom process can be served. Many other exactions can be required. And the fact that the foreign company has heretofore been licensed is no answer to such new legislation, and all foreign companies can be excluded from the state. But that is not the question before me for decision. If it were, I would sustain the contention of the attorney general. These companies have been, by legislation, invited to come into the state. They are here, and here lawfully. They are complying with all requirements of the state, unless it be the requirements of the statutes in question. They being here by invitation, and complying with all legal requirements, as they say, it cannot be exacted of them that they comply with illegal requirements, because an illegal requirement is none at all. An unconstitutional statute is no law. It seems clear to me that the complainants have the right to challenge these statutes. And it will not do for the respondents Mr. Cornell and Mr. Smythe, nor their successors, to say, as is said by their answer filed, that the laws are constitutional, but that they will not enforce them, and therefore there need be no injunction. If the laws are valid, they must be enforced, and a presumption well-nigh conclusive that they will enforce them. So the question for judicial determination is as to the validity of these statutes.

2. The statutes provide that for alleged infractions the companies may be cited to appear before the state auditor. From his decision an appeal can be taken to the state court. But because the auditor passes thereon it is insisted he is exercising judicial functions, and therefore the statutes are in conflict with the Nebraska constitution, which lodges all judicial power with the courts. I cannot sustain this contention of the companies; and upon this question, as well as others, I do not care to enter upon a discussion, which would be, and only could be, academic. If the companies, by appeal or other proceeding, can get a hearing before the courts, and there be given a trial by jury, or a trial according to the recognized chancery practice, as the nature of the case may require, then it has been tried according to due process of law and the law of the land, and has no just cause of complaint. Such are the holdings of the courts. I suppose all the states have special proceedings for the hearing of grievances, and such proceedings are sustained if along the line somewhere, and by some reasonable method, the party can have a hearing in the courts. And it is equally clear that such remedy is not to the exclusion of the power of a federal court to act. There may be a plain, speedy, and adequate remedy at law in the state courts, but with the proper parties, with the requisite citizenship, and the necessary amount involved, a federal court sitting in chancery may take hold

of the case, and order the proper decree. And the more so is this true when federal questions are presented, as in this case. And these conclusions, but briefly stated, obviate the discussion of many questions argued by counsel.

3. And it is insisted that the statutes are void because that in the litigation the companies are mulcted with an attorney's fee for the opposite party, but, when successful themselves, they cannot recover their attorney's fee. In Texas a statute was enacted which allowed the recovery by plaintiff of his attorney's fee, if successful, in a suit to recover for services performed for, or for the killing of live stock by, a railway company. In such litigation, if the railway company were successful, it could not recover its attorney's fee. The supreme court held the statute unconstitutional. Railway Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666. In Kansas there is a statute allowing the plaintiff to recover, in addition to his damages, an attorney's fee, in a suit for damages by fire set out by a railway company. The company, if successful, cannot recover its attorney's fee. This statute was held constitutional by the supreme court. Railroad Co. v. Matthews, 174 U. S. 96, 19 Sup. Ct. 609, 43 L. Ed. 909. In the first of these cases three justices dissented, and in the latter case four justices dissented. While the decisions can be reconciled, it is apparent that in the case at bar there is so much doubt about the question,—so much doubt what the supreme court or the court of appeals will hold,—that I deem it my duty to not hold the Nebraska statute unconstitutional on this ground; and, if I were to hold this provision invalid, such holding would not control the balance of the statute. And see Association v. Yoakum, 39 C. C. A. 56, 98 Fed. 251.

4. But that both of these statutes, in their general scope, are unconstitutional, I have no doubt; and, sitting as a trial court, and being free from all doubt, I must so declare; and, so holding, I shall as briefly as possible give my reasons. But I can serve no useful purpose by reviewing all the authorities cited by counsel. The cases arising under the "commerce clause" of the constitution are not in point, because insurance is not commerce. The one statute (senate file No. 2) is directed against fire insurance companies only. It declares as void all agreements by fire insurance companies as to any of the following things: (a) Relating to the rates to be charged for insurance; (b) the amounts of commissions to be charged by agents to their companies; (c) the manner of transacting the business of fire insurance. It is possible that the legislature can prohibit an agreement fixing the premiums to be charged; and yet it is difficult to believe that if, by such agreement, the rates were less than otherwise would be charged, such agreement would be unlawful, and yet an agreement to lower the rates becomes unlawful if that statute is valid. But, whether less or more, we all know that agreements are made as to other commodities in every community every day of the year. Employers of labor agree what they will pay, and laboring men agree for what sum only they will work, and the hours per day and per week they will work. Buyers, shippers, and venders of live stock, grain, gro-

ceries, clothing, anything and everything, are the subject of agreement, both by those who buy and those who sell. And yet the courts have gone further in limiting the right of contract as to rates to be charged for insurance than upon any other subject of legitimate business. Possibly that phase of the law is valid. But it is beyond my comprehension how the legislature can inhibit the making of contracts as to the amounts to be paid agents for securing insurance. The amount paid agents does not increase the cost to the insured. The cost to the insured is controlled by too many other factors, such as profits to the company, the economy of management, the moral as well as the physical hazard relating to the property insured, the rates of interest received on the surplus and capital, and interest paid on money borrowed, and no doubt many other things. How is such a provision the exercise of the police power? Still more obnoxious is the other provision, which declares all agreements void that relate to "the manner of transacting business." Is it possible that two or more companies cannot agree as to any of the following things: How many officers they shall have, or their duties; what are regarded as moral hazards; what are regarded as physical hazards; whether they will insure saloons, or bawdy houses, or dens of vice; whether they will take written applications, and whether they shall be annexed to the policies, or whether statements of the insured shall be warranties or representations; or whether they will do business by correspondence or by agents? If this statute prevails, then the manner of doing business, if by agreement, whether harmful or beneficial to good order and the welfare of the people of Nebraska, must be held as unlawful. And, if such legislation is valid, is not the boasted right of liberty of contract entirely subject to legislative control? And there is no more sacred right, under our government, than the right of contract. Without it, business cannot be transacted for a day by any person. Contracts, express or implied, enter into every transaction, with every person, every day of the year. Liberty does not mean alone out of jail, or from the clutches of the officer. Of course, for reasons of public policy, matters of immorality and crime cannot be the subject of contract. But it is not for the legislature alone to declare public policy. If this were so, then any contract can be denounced as against public policy, and the evils our fathers sought to be rid of are with us again. It has been but a few years since the belief was quite as general that commerce could be controlled by state legislation, until the remedy was many times worse than the evil. Judge John F. Dillon, once the honored judge of this court, last February (Marshall day), at Albany, said in a public address on the great chief justice:

"Mr. Justice Miller, speaking on this subject (Miller, Const. p. 81), truly declared: 'Notwithstanding for nearly one hundred years we have had in the federal constitution the declaration that congress shall have power to regulate commerce among the several states, there are at this hour, upon the statute books of almost every state, laws violating that provision, and there is no doubt that, if this clause were removed to-morrow, this Union would fall to pieces, simply by reason of the struggles of each state to make the property owned in the other states pay its expenses.'"

If Justice Miller had been speaking of the right of contract, he would have been equally severe on the attempt by many legislatures to break down such right. "Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," is the law of the land. If the pretense urged by some that legislatures and municipal councils can declare public policy, and then, by the exercise of the police power, make all business otherwise legitimate unlawful, then we have a written constitution to no purpose. The cases on this great subject are numerous, and they cannot all be reconciled. I do not care to review them, nor to allude to but few. It is sufficient for me to say that the police power of the state does not go to the extent of riding down plain provisions of the federal constitution, from which I have quoted. Some of the other objections to this statute I will not consider.

3. The other statute attempts to define a trust, declares all agreements with reference thereto as void, and for a violation of the statute imposes penalties. The statute is too lengthy to set it out in full herein, but it declares that any combination of capital, or skill, or acts by which persons seek to fix the price of any article, commodity, use, or merchandise with the intent to prevent others in a like business or occupation from conducting the business or occupation, is a trust, and especially so as to any of the following things: Restrictions in trade; to limit the production or increase or reduce the price of any commodity; to prevent competition in insurance, or in the making, transportation, sale, or purchase of any article; to fix any standard whereby its price to the public shall in any manner be established; to enter into any contract by which a party is not to deal in any article below a certain price, or by which the parties agree to keep the price at any sum. The statute declares any persons violating the statute shall be conspirators, and punished accordingly. Any corporation of the state violating the statute shall have its corporate existence declared forfeited by suit, and, if the complaining party is successful, an attorney's fee shall be taxed; but, if the corporation is successful, it must pay its own attorney's fees. Any foreign corporation violating the statute is to be driven from the state, and a like provision is recited as to attorney's fees. There are provisions entirely changing the rules of pleading and evidence in suits under the statute. Any person may bring the suit, and it is the imperative duty of the county attorneys to bring suits for the violation of the statute; and upon conviction an attorney's fee is taxed as costs, but, if successful, the company recovers no such fee. All contracts in violation of the statute are absolutely void. Any purchaser of a commodity in violation of the statute can plead the violation as a complete defense in an action to recover the purchase price. Any person injured in his business, property, or employment by any violation of the statute can recover damages and an attorney's fee, but the defendant, if successful, cannot recover such fee. Any person or corporation accused of violating the statute in any manner can be compelled to furnish all books and papers bearing on the question, but exempts such person from a conviction on such evidence. Finally, the statute exempts

any assembly or association of laboring men from the provisions of the statute. Such is a general statement of the statute. Many, and perhaps most, people believe a trust to be an evil, and many believe they can be exterminated by state legislation. Probably some of them can. But, if legislation like this can be sustained, then matters which have been the subject of contract from time immemorial cannot longer be covered by agreements. It cannot be said of this statute that any one material provision may be held void, and allow the balance of the statute to stand, and be enforced. Of some statutes that rule can be invoked. But in this statute practically every recital refers almost directly to every other provision. Every poisonous phase permeates the entire scheme, and it only remains to show what some of them are. If this statute is valid, two men in the same line of business in the same town or village cannot form a partnership if it tends to maintain prices. They must continue, each for himself, until one or the other or both are destroyed. Neither can a stock company nor a corporation be formed by two or more if, by so doing, the price is maintained. This statute is not a step, but it is a long stride,—hundreds of years,—backward, when monarchs, cabinet officers, and even parliament decreed the price to be paid for a day's labor, and the cost of all the necessaries of life, even to the loaf of bread. Any one with but the slightest knowledge of history will recall what tyranny and brutality existed in England by reason of such laws, and in France down to the Revolution. If this statute is valid, the next step may be, and can be, and probably will be, the granting of exclusive rights to certain persons, only, to pursue an occupation. It would be probable, because those let in would be the more thrifty. Drive out three-fourths of the barbers, or waiters, or carpenters, or blacksmiths, and those remaining would be thrifty, even at the old price. Competition and contracts would be at an end. If we cannot acquire property, then we have a government of socialism. And how can we acquire property, or enjoy the property we do have, without the right of contract? If this law is valid, two or more farmers cannot agree that they will not sell their wheat to a neighboring mill for less than so much per bushel. Two or more farmers cannot agree that the live-stock feeder shall not have their corn, only at a certain price. Blacksmiths cannot agree that they will charge so much for shoeing horses. Nothing can be agreed to by the manufacturer, the farmer, gardener, the contractor, consumer, or laborer to prevent the reduction of price. Can it be possible that such legislation is valid? If it is valid, then what becomes of the provision, "No man shall be deprived of equal protection of the law," or of that other provision, "No man shall be deprived of life, liberty, or property without due process of law?" Justice Field once said: "The right to pursue them without let or hindrance is a distinguishing privilege of the citizens of the United States, and an essential element of that freedom which is their birthright." Another justice of the United States supreme court said: "Yet the power does not and cannot extend to prohibiting a citizen from making contracts, and this is institutional law in England as well as America." Another great judge has said: "Liberty includes the right to acquire prop-

erty, and that means and includes the right to make and enforce contracts." And I dare say that there is not an appellate court in this Union but has given a like definition of liberty,—"the right to make and enforce contracts." Without it, in the language of Justice Miller, emphasized by Judge Dillon, already quoted, "And there is no doubt that, if this clause were removed to-morrow, this Union would fall to pieces." We could not exist as a free people, but would be the slaves to every legislature that could be carried off its feet by first one public clamor and then another. Parties cannot only make contracts, but they may violate them, subject to being held responsible in damages. It will be recalled that a few years ago one of the United States judges issued an injunction in effect prohibiting employés of a railroad from agreeing in a body to quit work. The court of appeals of the Seventh circuit, presided over by Justice Harlan, of the supreme court, reversed the decision, in effect holding that it was lawful for the employés by agreement to quit in a body because their wages had been cut down. Citations could be made at great length from jurists and statesmen, practically without conflict, as to the right of contract being the greatest of all blessings enjoyed by a free people, and guarantied us by the constitution so long as that instrument may last. And when the work of a lawmaking power conflicts with the constitution, there can be but one choice as to which ought to prevail. "No man shall be deprived of the equal protection of the laws" says the constitution.

The statute expressly excepts from its provisions assemblies or associations of laboring men. By saying that associations of laboring men are exempt from the provisions of the statute, it is thereby stated, in meaning, that unorganized labor must pay the penalties of a criminal statute for an act done by a member of an organization, and by him done with impunity. On one side, by this legislation, we have organized labor. Those men are not amenable to the statute. On the other side we have men who do not belong to organized labor,—farmers, merchants, professional men, laborers, as well as all others. They are amenable, and by this statute that is called "equal protection." I do not believe it. Such legislation has been denounced by the supreme court of Nebraska. Low v. Printing Co., 41 Neb. 127, 59 N. W. 362. Dozens of statutes have been held invalid by appellate courts which sought to make it invalid for one class of men to do one thing and lawful for other men, practically under the same circumstances, to do another, but like, thing.

5. The Railroad Traffic Association Case, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, by the United States supreme court has been strongly urged by the attorney general as upholding the doctrine of this statute. But it does not, for the reason that the statute under consideration in that case was upheld by reason of the commerce clause of the constitution; and to that extent the commerce clause controlled the other clauses of the constitution; and I repeat that the statute with which I am dealing is a state statute.

6. Finally, it is claimed that as against foreign corporations the case of Waters v. Texas, 177 U. S. 28, 20 Sup. Ct. 518, 44 L. Ed. 657, forecloses the question, and in this I think the attorney general

and his deputy are mistaken. There the Waters Company, a foreign corporation, was licensed and went into the state at a time when there was in force a valid statute prohibiting foreign corporations from doing certain things, which it failed to observe. At all events, the validity of the statute in force when it went into the state was not challenged. The attorney general of Texas brought proceedings to oust it from the state. The opinion of the supreme court of the United States fortifies the proposition that a foreign corporation can only come into and remain in a state by the grace of the state. Subsequently Texas passed a statute, the validity of which was challenged by the foreign corporation. But the supreme court said, in substance, that it was wholly immaterial whether the later statute was valid or invalid. If valid, the judgment of ouster would be sustained; and, if invalid, the old law under which it came into the state was in force, and under the old law the judgment of ouster would be sustained. More than this cannot be claimed for that case. But that is not the question in the case at bar. These complainants were rightfully in Nebraska when these illegal or unconstitutional statutes were passed, and the question is this: Does the passage of an unconstitutional statute amount to the withdrawal of consent for a foreign corporation to remain in the state? I had supposed, and still believe, that an unconstitutional law was as though never passed. How can an unconstitutional statute be regarded as a withdrawal of consent to a foreign insurance company to remain and do business in the state? That the legislature of Nebraska can withdraw such consent, there can be no doubt. That the legislature can place onerous burdens on the foreign insurance companies, I have no doubt. That the legislature can discriminate in favor of Nebraska insurance companies, and against foreign insurance companies, is to me equally clear. A strong presentation of these matters is made by Judge Shiras in the case of Insurance Co. v. Herriott (C. C.) 91 Fed. 711. But the statutes with which I am dealing apply to all insurance companies, resident and foreign, and the statutes are equally void, in my judgment, as to all; and I can reach no other conclusion but that complainants should have a decree, and it is so ordered.