THE STATE OF KANSAS v. HENRY WILSON.

No. 493.

CONSTITUTIONAL LAW—*Police Power*—"*Screen Law*" *not Unconstitutional*.    Chapter 188, Laws of 1883, entitled "An act to regulate the weighing of coal at the mine," *held* valid, and not in conflict with the constitution of the state or the United States.

Appeal from Crawford district court; W. L. SIMONS, judge.    Opinion filed May 19, 1898.    Affirmed.

*Morris Cliggitt,* and *Fuller & Randolph*, for appellant.
*L. C. Boyle,* attorney-general, and *T. J. Widby*, county attorney, for The State.

The opinion of the court was delivered by

MILTON, J. : Appeal by Henry Wilson from a conviction under an information charging a violation of the provisions of chapter 188, Laws of 1893. The case was tried by the court upon an agreed statement of facts, a jury having been waived. The title of said chapter is, "An act to regulate the weighing of coal at the mines." Section 1 reads :

" It shall be unlawful for any mine owner, lessee or operator of coal-mines in this state, employing miners at bushel or ton rates or other quantity, to pass the output of coal · mined by said miners over any screen or other device which shall take any part from the value thereof before the same shall have been weighed and duly credited to the employees and accounted for at the legal rate of weight as fixed by the laws of Kansas."

Section 2 requires that the weighman employed at any mine shall subscribe an oath to do justice between employer and employee and to weigh the output of coal from the mine in accordance with the provisions of section 1, and makes a violation of the act a misdemeanor.

Section 3 provides that the miners employed by or working for any mine owner may employ a check weighman.

Section 4 relates to fraudulent weighing.

Section 5 reads :

"Any provision, contract or agreement between mine owners or operators thereof and the miners employed therein, whereby the provisions of section 1 of this act are waived, modified, or annulled, shall be void and of no effect ; and the coal sent to the surface shall be accepted or rejected ; and if accepted, shall be weighed in accordance with the provisions of this act ; and right of action shall not be invalidated by reason of any contract or agreement."

The information charged, substantially in the language of the first section of the statute, that Wilson was the superintendent and agent of the Mount Carmel Coal Company, a private corporation organized under the laws of this state and engaged in the business of mining and selling coal for private gain; and that as such superintendent and agent he knowingly directed and caused all the output of coal from the company's mines, produced by its miners employed at ton rates, to be passed over screens before such output had been weighed—but with the knowledge of and by virtue of a contract with the miners—whereby a large part of the value of the coal was taken therefrom before the same had been weighed and duly credited to the miners and accounted for at the legal rate of weights as fixed by the laws of Kansas.

The agreed statement of facts practically admitted the allegations of the information, and added thereto that the miners were employed by Wilson under contracts providing for payment at ton rates, that the output of the mines should be passed over screens before being weighed, and that the miners should be paid at the rate of ninety-five cents per ton of screened coal; that a portion of the coal, consisting of "nut" and "slack," produced by the miners, passed through the screen and did not reach the scales and was not weighed, and that such slack and nut coal so deducted from the output of the mine by screening had a marketable value; that to comply with the provisions of this act would require the coal company to purchase an extra set of scales; that all of the miners in the employ of the coal company were of full age and legally competent to contract and to be contracted with.

Counsel have very ably and exhaustively argued

The State v. Wilson.

the questions arising in this case and in the case of *The State v. Haun*, post, the two cases being submitted together, the latter involving the validity of chapter 145, Laws of 1897, commonly called the "anti-scrip law." We have found it necessary to prepare separate opinions.

Appellant claims that the act under which he was convicted is unconstitutional and void for the reason that it is violative of the bill of rights of this state, and also of section 1 of the fourteenth amendment to the federal constitution, this being the principal contention. It is also claimed that under the facts of the case appellant is not guilty, even if the law is valid.

I. Referring to the last-stated contention, which is presented first in appellant's brief, we remark that his counsel, throughout their whole argument, assume that the object of this act is to *regulate the rate of wages* to be paid by mine operators to their employees. We think this assumption is unwarranted, and that, in so far as the arguments of counsel rest upon it, the arguments upon that contention are irrelevant to the questions which properly arise in the case. It would hardly be claimed that the act would be valid, within the provisions of section 16 of article 2 of the state constitution, if the body of the act contained provisions fixing the rate of wages of miners, under the title "An act to regulate the weighing of coal at the mine."

Counsel say that it was clearly the intention of the legislature to punish the act of passing the output of a coal-mine over a screen or other device which should take any part from its value in determining the wages or compensation to be paid the miners, or its value as the measure of the wages to be received; and that where any part of its value as such measure is not only not taken away, but is increased by screening —

as they claim is true in this case — such an act is not a violation of the law. We cannot agree with this construction of the statute. It was manifestly the intention of the legislature to require that where a screen is used by any mine operator the same shall not be employed prior to the weighing of the coal, if the use of the screen would take from the coal any part thereof which has a money value. It is not an act to prohibit the screening of coal, but it is an act to regulate the weighing of coal before screening. The agreed statement of facts shows that the law was disregarded in this case. It also shows that to comply with the provisions of this law would require the coal company to purchase an extra set of scales ; that is, the evidence shows that, while the act has been a law of the state for more than four years, the coal company had made no provision for complying with its terms. It is plain that the company has rested upon its "constitutional rights" while declining to obey a statute. It has asserted its "inalienable right" of contracting in defiance of law.

II. In support of the claim of the unconstitutionality of this enactment, counsel argue at great length that a legislative act may be unconstitutional where it invades the inherent rights of the citizen to life, liberty, and the pursuit of happiness, even if no express constitutional provision is violated. Much research has been devoted to this branch of the case and it is presented with great clearness and vigor. The proposition is sustained by a multitude of authorities. The limitation to this rule is that a very clear case of such invasion of rights must appear to justify a court in holding an act to be unconstitutional upon the ground stated. As a basis to their argument that this act violates section 1 of our bill of rights and section

The State v. Wilson.

1 of the fourteenth amendment to the constitution of the United States, counsel for appellant say :

" What does the statute in question attempt to do? If the contention on behalf of the state is correct, section 1 makes it unlawful for any mine owner, lessee or operator of coal-mines in this state employing miners at bushel, ton or other quantity rates to make any contract with the miner for compensation on the basis of screened coal."

They further say that, if the statute is valid, a contract which modifies or violates its terms is void, and that, no matter how beneficial it would be to the miner to enter into a contract for screened coal, for which he might receive a much greater price per ton than for unscreened or "mine-run coal," he could not maintain an action to recover his wages under such a contract, and that, in any event, his recovery would be limited to the price for mining unscreened coal. They also maintain that the effect of the law is to destroy the right of the miner to contract in respect to his own labor ; that the right of contracting is a property right ; that labor is property, and that the right to labor and to make contracts in respect thereto upon such terms as may be agreed upon between the parties is included in the declaration set forth in section 1 of our bill of rights. Copious citations of authorities are made in support of these propositions. We have already referred to what we consider a fundamental error in the theory of the appellant, in that he claims the object and purpose of this act to be the regulation of the wages of the miners. His counsel have repeatedly stated that it must be presumed in this case that the miners, with different propositions respecting the basis for the payment of their wages open before them, have chosen the proposition most favorable to themselves. Throughout their whole argument the

28—7 KAN. APP.

idea that this act is intended to fix and regulate wages is kept prominent. As we have already stated, we should hold this law to be invalid if it in terms expressed such purpose, but that neither the title of the act nor the act itself directly or indirectly purports to relate to the matter of wages. If, therefore, the construction counsel seek to place upon this act be held erroneous, their arguments and deductions along this line can have no great weight in determining its constitutionality.

We regard this law as being what it purports to be, as set forth in its title, and that it is intended as a police regulation, general in its application to all owners of coal-mines and laborers who work in such mines. It is not, therefore, objectionable as being class legislation. In *Beer Co. v. Massachusetts*, 97 U. S. 33, Bradley, J., said :

"Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens and to the preservation of good order and public morals."

In *K. P. Rly. Co. v. Mower*, 16 Kan. 573, 576, the court, by BREWER, J., in speaking of the police power, said :

"It aims to regulate the intercourse of citizen with citizen, to prescribe the manner of using one's property and pursuing one's occupation so as not to trespass on the property or rights of others, and, as such, is a power whose necessities and uses grow with the increasing complexities of our civilization and the increasing diversities in the industries and modes of life. The sphere, therefore, of its operation, is ever widening."

In the case of *Holden v. Hardy*, 18 Sup. Ct. Rep. 383, these questions are exhaustively considered. That case involved the validity of a statute of the state of Utah which limited the period of employment of working men in Utah underground mines or workings, and of laborers in smelter and other works for the reduction or refining of ores or metals, to eight hours per day. The constitutionality of the statute was challenged upon the ground that it abridges the privileges and immunities of citizens of the United States, depriving both the employer and the laborer of property without due process of law, and denies to them the equal protection of the laws. It appears that the miners had voluntarily engaged to work for more than eight hours per day. We quote freely from the opinion, as it has an important bearing upon the question here presented. After reference to the police power, it is said :

" While this court has held — notably in the cases of *New Orleans v. Davidson*, 95 U. S. 465, and *Yick Wo v. Hopkins*, 118 U. S. 356 — that the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may lawfully be resorted to for the purpose of preserving the public health, safety, or morals, or the abatement of public nuisances, and a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. (*Lawton v. Steele*, 152 U. S. 133.)"

After reviewing divers regulations which have been adopted by various states in respect to mines and mining, for the protection of the operatives, and other legislation in the interest of the safety of the public and employed persons, the court observes :

" But if it be within the power of the legislature to adopt such means to protect the lives of its citizens, it

is difficult to see why laws may not also be adopted for the protection of their health and morals."

The court states that while the constitutionality of laws limiting the hours during which women and children may be employed in factories has been doubted in some of the states, at least as applied to women, such laws have been generally upheld as health or police regulations, citing *Commonwealth v. Hamilton Mfg. Co.*, 120 Mass. 388. One of the most important declarations made by the court is as follows:

" The legislature has also recognized the fact, which the experience of legislators in many states has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employees, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules, and the laborers are practically constrained to obey them. In such cases self interest is often an unsafe guide, and the legislature may properly interpose its authority.

" It may not be improper to suggest in this connection, that although the prosecution was against the employer of labor, who apparently, under the statute, is the only one liable, his defense is not so much that his right to contract has been infringed upon, but that the act works a peculiar hardship to his employees, whose right to labor as long as they please is alleged to be thereby violated. This argument would certainly come with better grace and greater cogency from the latter class. But the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equality, or where the public health demands that one party to

the contract shall be protected against himself. 'The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety and welfare are sacrificed or neglected the state must suffer.' "

The court quotes with approval two paragraphs from the opinion of the supreme court of Utah, in which occurs this language :

" Though reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether the law is calculated or adapted to promote the health, safety or comfort of the people, or to secure good order or to promote the general welfare, we must resolve them in favor of the right of that department of government."

In concluding its opinion, the court announced the proper test to be applied to legislation of the character here being considered, as follows :

" The question in each case is whether the legislature has adopted the statute in the exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination or the oppression or spoliation of a particular class."

We are not to inquire into the motive nor to question the wisdom of the legislature in the enactment of the present law. In *Munn v. Illinois*, 94 U. S. 113, 132, which involved the construction of a statute regulating elevator charges, the court pointed out certain new provisions which the people of Illinois had placed in their amended constitution, whereby it was made the duty of the general assembly to enact laws respecting the transportation of grain and its storage in elevators, and said :

" This indicates very clearly that during the twenty years in which this peculiar business had been assuming its present 'immense proportions' something had

occurred which led the whole body of the people to suppose that remedies such as are usually employed to prevent abuses by virtual monopolies might not be inappropriate here.    For our purposes, we must assume that if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed.    For us the question is one of power, not of expediency.    If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state.    But if it could, we must presume it did.    Of the propriety of legislative interference within the scope of legislative power, the legislature is the exclusive judge.''

It is a matter of current history, with which all citizens are familiar, that serious differences have arisen between mine operators and their employees as a result of the use of devices for screening coal. The reports of the labor bureaus of all the states wherein coal-mines are operated abound in information upon this subject.    It is evident the legislature regarded the weighing of coal at the mine before screening as being properly subject to and requiring regulation.    Of course, where screens are not used the entire output of coal produced by each miner is weighed.    Where screens are employed such output is required to be weighed, if the effect of the screening would be to remove a portion—having value—of such output.    The tendency of such a law would be to prevent possible fraud and imposition by the mine owner, and to place operator and operative upon a more nearly equal basis in respect to their mutual relations and interests than would otherwise exist. Counsel for appellant say : '' It need not be argued to this court that where different propositions are open to the choice of men, whether they be coal-miners or wood-choppers, it will be presumed that

the proposition most favorable to them will be accepted,'' and that it must be presumed in this case that the miners agreed to that proposition which insured or promised to them the best wages. The objection to this view is the assumption that an option was presented to the miners as to the basis of their contracts. As already noted, the coal company had made no provision for weighing coal before screening the same, from which it is clear that the assumed option could not have been exercised. Until proper provision is made for weighing the coal, the miner cannot exercise a choice. In the way provided by this statute, and in no other way, will an equitable basis be reached. As stated by the supreme court in the case of *Holden v. Hardy*, supra, proprietors of coal-mines and their operatives do not stand upon an equality, and their interests are to a certain extent conflicting.

III. But, as we view this act, it is by no means an innovation or a legislative novelty. Not only is it not novel or at variance with present legislation elsewhere, but the principle involved has been expressed in other statutes of this state for many years, and has been embodied in the laws of some of the older states for almost a century.

In our statutes relating to cities of the first class, it is provided that the council may prescribe rules for weighing and measuring every commodity sold in the city, in all cases not otherwise provided for by law, and may provide for the weighing of hay, grain, and coal, and regulate and prescribe the place or places of sale of such articles. In the statutes relating to cities of the second class similar provisions are made ; and cities of the third class, in addition to the provisions for such weighing, are empowered to purchase and

locate public scales for such weighing and to appoint a weighmaster.

In *Stokes & Gilbert v. City of New York*, 14 Wend. 88, an ordinance imposing a penalty upon any vendor of anthracite coal who should sell the same without first having it weighed was attacked as being a violation of the constitution and bill of rights of the state and of the constitution of the United States. The court sustained the ordinance, holding it to be not a restraint upon trade, but a regulation of it, and not unreasonable.

In *Yates v. The City of Milwaukee*, 12 Wis. 673, an ordinance which forbade the exposing of any load of hay for sale in certain wards of the city before having the same weighed on the city scales and obtaining a certificate of the weight thereof, to be exhibited to the purchaser before receiving payment, was held not unreasonable, oppressive, or repugnant to the constitution and laws of the state. The court cited *Stokes v. City of New York*, supra, and said : "It is not an ordinance in restraint of trade, but a most salutary regulation of it, and designed to prevent fraud and imposition upon the citizens."

In *Eaton v. Kegan*, 114 Mass. 433, the court sustained the constitutionality of a statute which provided that in all contracts for the sale and delivery of oats and meal the same should be bargained for and sold by the bushel, and prescribed the weight per bushel of such articles. The court held that sales contrary to the statute were void, and that recovery could not be had for the price of the articles so sold. The court said :

"The statute does not in terms prohibit other sales or attach a penalty to a violation of this provision ; but it does in terms direct and prescribe in what mode the contract for the sale and delivery of oats and meal

The State v. Wilson.

shall be made ; that they shall be bargained for and sold by the bushel. Not following this direction is equivalent to disobeying a prohibition. This form of contract is enacted for the benefit of the buyer, and is the legal mode of selling such commodities.''

In the *City of Charleston v. Rogers*, 2 McCord, 293, the validity of an ordinance passed in the year 1810, regulating the weighing and selling of coal, was sustained, the court observing that it only required that when coal should be transferred it must be measured in a particular way. In *Vanderbilt v. Adams, Treasurer*, 7 Cow. 349, the validity of an ordinance of the city of New York regulating the use of wharves was questioned. In sustaining the ordinance, the court said :

'' The sovereign power in a community, therefore, may and ought to prescribe the manner of exercising individual rights over property. It is for the better protection and enjoyment of that absolute dominion which the individual claims. The powers rest upon the implied right and duty of the supreme power to protect all by statutory regulations, so that, on the whole, the benefit of all is promoted. . . . Such a power is incident to every well-regulated society, without which it could not well exist.''

In the case of *Eaton v. Kegan*, supra, the court declared that the statute was enacted for the benefit of the buyer of certain commodities, and in *Yates v. The City of Milwaukee*, supra, it was said that the ordinance was designed to prevent fraud and imposition upon the citizens.

In *Vanderbilt v. Adams, Treasurer*, supra, the declaration is that police powers rest upon the implied right and duty of the supreme power to protect all by a statutory regulation, so that, on the whole, the benefit of all is promoted ; and that every public regulation

may, and does in some sense, restrict the absolute right that existed previously.

If such regulations as we have just considered are valid, this act requiring the weighing of coal at the mine is also valid.  If statutes may be enacted for the benefit of the buyer who is otherwise without protection from fraud and imposition, laws may be enacted to protect the seller who would otherwise be liable to imposition and fraud.  The difference in principle between the two instances is ethereal.  The law's consideration and protection are extended to the party occupying the disadvantageous position.

In this case, it may be said that the miner has brought the product of his toil *to the market* when the car containing the coal he has mined rests beneath the sun which shines not where he delves, just as truly as the farmer has brought his hay to market when he enters the city where it is to be weighed and delivered to a customer, and where he may be required by ordinance to have it weighed on scales not of his choosing. To weigh coal before it is screened is to preserve the weight of the entire product of the miner's labor.  He may be far beneath the surface of the earth engaged in his arduous task, but if what he produces is properly weighed in accordance with the law and subsequently accounted for, he is put upon a basis of equality with the purchaser, the operator of the mine, in matters of contract relating to such product.

We have examined a very large number of the authorities cited and all of those which bear directly upon the questions which we think actually arise in the case, and shall now review the cases cited by counsel which arose under laws concerning the weighing of coal at the mines.   The case of *Millett v. The People*, 117 Ill. 294, involved the validity of an act the

title of which was identical with that here considered. That law required that all coal mined in the state should be weighed at the mine at the expense of the operator, and prior to the screening of the coal. The supreme court, in construing this act, held that it prohibited the making of contracts for computing wages of the miners upon any other basis than that of unscreened coal, and its decision against the constitutionality of the act rests upon such construction, as is shown by the following from its opinion :

"We recognize fully the right of the general assembly, subject to the paramount authority of congress, to prescribe weights and measures, and to enforce their use in proper cases ; but we do not think that the general assembly has power to deny to persons in one kind of business the privilege to contract for labor and to sell their products without regard to weight, while at the same time allowing to persons in all other kinds of business this privilege. . . . So far as the owner or operator of a mine shall contract for the mining of coal or the selling of coal by weight, we see no objection to the statute as imposing upon him the duty of procuring scales for that purpose. But we do not think that he can be compelled to make all his contracts in these respects to be regulated by weight."

The court refers to the case of *Jones v. The People*, 110 Ill. 590, wherein the original act requiring the weighing of coal at the mine was considered, and remarked that it had held in the latter case that the said law did not require that in contracts for the mining of coal the wages of the miners must be computed upon the basis of the coal mined. It will be observed that in this case — *Jones v. The People* — the court did not declare the law unconstitutional. After the decision in *Millett v. The People*, supra, the Illinois assembly amended the act there declared unconstitu-

tional, and this latter law was considered by the court in *Ramsey v. The People*, 142 Ill. 380.   The act made it "unlawful for any owner, agent or operator of any coal-mine whose miners· are paid upon the basis of the quantity of the coal which each shall mine·and deliver to said employer, to take any portion of the same by any process of screening, or by any other device, without fully accounting for and crediting the same to the miner from whose output such portion is screened or taken."

The court held that the law attempted to take away from both employer and employee the right and power of fixing by contract the manner in which wages were to be ascertained, and made it imperative where the miner was paid on the basis of the coal mined, whatever might be the wishes or interest of the parties, that the compensation should be computed on the weight of the unscreened coal.   As we have already said, we do not regard the statute now before as making any such requirement in respect to the basis of compensation of the wages of the miners.   We think, therefore, that these Illinois decisions cannot properly guide us in determining this case.   It is true, however, that the language quoted from *Millett v. People*, supra, tends to sustain the conclusion we have reached in favor of the validity of our statute.

In the case of *Smith v. The State*, 90 Tenn. 575, which announces a principle we think applicable here, the syllabus reads :

"Conviction for a violation of the statute making it unlawful for ' any weighman, agent, or check measurer, whether employed by operators or miners, knowingly or wilfully to adopt or take more or less pounds for a bushel or ton than is now provided by law ' is supported by the evidence, where it appears that the defendant was a weighman employed by the operators

of a coal-mine to weigh the coal dug by each miner as a basis for his compensation; and that, pursuant to a custom assented to by express contract by most of the miners employed, and known to and acquiesced in by all, the defendant allowed only 2500 pounds per car-load, when its weight, in fact, exceeded that limit. Parties may not by contract dispense with the criminal law."

In the opinion in this case, the court said:

"It is further insisted that the miners may agree that if a car contains 2500 pounds it shall not be weighed; that they may give away coal if they wish, and therefore the defendant is not guilty. In answer to these propositions, it is sufficient to say that the statute provided for the weighing of the coal at every coal-mine in this state. The miners are within the mountain or beneath the surface, and they have a right to know what amount of coal they have mined during the day."

The West Virginia case of *Peel Splint Coal Co. v. State*, 36 W. Va. 802, arose under two acts of the legislature, known respectively as the "scrip act," of March 7, 1891, and the "screening act," of March 9, 1891. The latter act required that all coal mined, and paid for by weight, should be weighed in the car in which it is removed from the mine, before it is screened, and should be paid for according to the weight so ascertained, at such price per ton as might be agreed upon by the operator and the miners. Referring to the use of the screen, the court said that, so far as it entered as an element in determining what coal resulting from his labor the miner should be paid for, it was abolished. The validity of both the said acts was sustained by the court, but the decision appears to rest largely upon the ground of legislative authority to amend corporate charters. This decision practically overrules the prior decisions of that court

in *State v. Goodwill*, 33 W. Va. 179, and *State v. F. C. Coal and Coke Co.*, 33 id. 188, in which the validity of the two West Virginia statutes was involved, the one prohibiting the issuance by manufacturers or mine owners of "scrip" in payment of wages to laborers and the other forbidding persons and corporations engaged in mining and manufacturing from selling merchandise and supplies to their employees at a greater per cent. of profit than that at which they sold goods to others not employed by them.

In conclusion : We have given the important matters here involved much consideration, with the earnest desire to reach a right decision. Our judgment has not been persuaded that this act violates either the letter or the spirit of the constitution of this state or that of the United States. We are unable to affirm that the legislature has not "adopted the statute in the exercise of a reasonable discretion."

Guided by the rule laid down by our supreme court in *The State v. Barrett*, 27 Kan. 213, that " the action of the lawmaking power must in all cases be upheld unless its action is manifestly in contravention of the constitution," we hold chapter 188, Laws of 1893, to be constitutional and valid. The judgment of the trial court is affirmed.