THE STATE EX REL. ZILLMER, Plaintiff in error, vs. KREUTZBERG, Defendant in error.

*February 1—June 19, 1902.*

*Constitutional law: "Liberty." Right of private contract: Police power: Forbidding discharge of employee because member of labor union.*

Ch. 332, Laws of 1899, so far as it makes it an offense for any person or corporation to "discharge an employee because he is a member of any labor organization," is not a valid exercise of the police power, but is an unwarranted interference with freedom in making private contracts, and is void as an infringement of the right to "liberty and the pursuit of happiness," guaranteed by the state and federal constitutions.

ERROR to review an order of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Affirmed.*

   The defendant in error having been arrested upon a complaint charging him with having unlawfully discharged an employee because said employee was a member of a labor organization, and, upon hearing, having been committed for trial, he sued out a writ of *habeas corpus* against the sheriff, alleging the illegality of his imprisonment and restraint, for that the act of the legislature creating the offense (ch. 332, Laws of 1899) is unconstitutional, because it violates the following provisions of the constitutions of the state of Wisconsin and of the United States:

   (1) That "all men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, govern-

ments are instituted among men, deriving their just powers from the consent of the governed."

(2) That no person shall be deprived of life, liberty, or property without due process of law.

(3) The constitutional provision forbidding the legislature to grant any special or exclusive rights, privileges, or immunity to any individual, corporation, or association.

(4) The provision of the fourteenth amendment to the constitution of the United States, providing, "Nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The sheriff returned that he held the defendant upon a commitment of the examining magistrate for trial upon a charge as above described. The superior court held the law unconstitutional, and the commitment of the defendant therefore beyond the jurisdiction of the examining magistrate, and ordered discharge from imprisonment, to which order or judgment the sheriff of Milwaukee county and the state of Wisconsin sued out writ of error from this court.

For the plaintiff in error there was a brief by *W. H. Bennett,* district attorney, and *Francis E. McGovern,* assistant district attorney, and oral argument by *Mr. McGovern* and *Mr. C. E. Buell,* first assistant attorney general.

For the defendant in error there was a brief by *Nath. Pereles & Sons,* attorneys, and *G. D. Goff,* of counsel, and oral argument by *Mr. Goff.*

Dodge, J. In this case we are confronted with that gravest of sociological questions: How far, consistently with freedom, may the rights and liberties of the individual member of society be subordinated to the will of the government? That question has been at war from the very first existence of any form of government. For many centuries, while debated as an ethical and philosophical question, it was resolved

in each instance by force or by the ability to exert force. A little more than a century ago the attempt was made by the American people to define the limits by written contract, and to withdraw their decision and vindication from the arena of physical strife and transfer it to the peaceful forum of the judiciary. In line with that attempt, the people of what is now the commonwealth of Wisconsin, some sixty years ago, formulated their constitution. Their purpose, unquestionably, was to create a government endowed with the essential attributes of sovereignty. The very preamble declares that it is adopted in order to secure the blessings of liberty and form a more perfect government. In the organization of that government it was provided that the legislative power shall be vested in a senate and assembly. Const. art. IV, sec. 1. By a long line of decisions and *consensus* therein by the people of the various states, it has become settled that thereby all powers of a legislative character ordinarily enjoyed by sovereign governments became vested in the state legislature, except so far as restrained expressly or by substantially necessary implication elsewhere in the constitution. Cooley, Const. Lim. 201, 206; 1 Tiedeman, Cont. of Pers. & Prop. 9. The very first section of that constitution, however, declares the purpose of the government about to be created by it in these words:

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

At this late day it cannot be doubted that this declaration of the purpose to be accomplished is to be construed as a limitation upon the powers given. By the preamble, preservation of liberty is given precedence over the establishment of government. It would be inconceivable that the people of Wisconsin, in establishing a government to secure the rights

of life, liberty, and the pursuit of happiness, should by general grant of legislative power have intended to confer upon that government authority to wholly subvert those primary rights; and in this view it has been held by this court that legislative acts conflicting with that declared purpose are forbidden by the constitution, and must be denied efficacy by the courts. *Durkee v. Janesville,* 28 Wis. 464, 471; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 435, 87 N. W. 561. We say by the courts, for elsewhere in the constitution the judicial power is vested in them; and that the judicial power, and therefore the judicial duty, includes repudiation of an attempted act of legislation prohibited by the constitution, was declared by the supreme court of the United States, at the pen of Chief Justice MARSHALL, in *Marbury v. Madison,* 1 Cranch, 137, and had, before the adoption of our constitution, become settled by a long line of authority. 1 Kent, Comm. 449; Cooley, Const. Lim. ch. 7; *Baily v. Gentry,* 1 Mo. 116; *Bloodgood v. M. & H. R. Co.* 18 Wend. 9; *Dartmouth College Case,* 4 Wheat. 518, 625.

A question which immediately arises in the consideration of any act of the legislature restraining individuals is the exact meaning of the words, "life, liberty and the pursuit of happiness," which are to be secured by the government, and must not be destroyed by it. That these words are not to be taken in their absolute sense is, of course, obvious. Individuals may, notwithstanding this prohibition, be deprived of life or liberty as punishment for crime, and they may be deprived of some measure of property or of happiness in deference to and protection of the welfare of the whole community. Indeed, most of the legislative acts which fill our statute books detract in some measure from the absolute freedom of the individual to act wholly at the dictate of his will, and yet are of either decided or fully recognized constitutionality. On the other hand, these words in the constitution are not to receive an unduly limited construction. It has become settled,

for example, that "liberty" does not mean merely immunity from imprisonment, and that "property" is not confined to tangible objects which can be passed from hand to hand; that within the former word is included the opportunity to do those things which are ordinarily done by free men, and the right of each individual to regulate his own affairs, so far as consistent with rights of others; and within the latter, those rights of possession, disposal, management, and of contracting with reference thereto, which render property useful, valuable, and a source of happiness, right to pursuit of which is preserved. 2 Story, Const. (5th ed.) § 1950; Cooley, Torts, 278; 2 Tiedeman, Cont. of Pers. & Prop. 939; *Butchers' Union S. & L. L. Co. v. Crescent City L. & S. Co.* 111 U. S. 746, 757, 4 Sup. Ct. 652; *Allgeyer v. Louisiana,* 165 U. S. 578, 589, 17 Sup. Ct. 427; *Niagara F. Ins. Co. v. Cornell* (C. C.) 110 Fed. 816, 822; *State v. Julow,* 129 Mo. 163, 31 S. W. 781; *Ritchie v. People,* 155 Ill. 98, 40 N. E. 454; *Gillespie v. People,* 188 Ill. 176, 58 N. E. 1007; *Comm. v. Perry,* 155 Mass. 117, 28 N. E. 1126; *In re Jacobs,* 98 N. Y. 98; *People ex rel. Rodgers v. Coler,* 166 N. Y. 1, 59 N. E. 716; *Janesville v. Carpenter,* 77 Wis. 288, 301, 46 N. W. 128.

In *Allgeyer v. Louisiana, supra,* the court said by Mr. Justice PECKHAM:

"The liberty mentioned in that [fourteenth] amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned."

In *Carew v. Rutherford,* 106 Mass. 1, 14, it is pointed out that the very existence of the ordinary labor union rests upon

the inherent liberty of individuals to contract or refuse to do so, otherwise such organizations would be criminal at common law. In that case, too, are collected actual instances of governmental restriction of liberty deemed legitimate before our constitutions, but now clearly prohibited thereby. Some of these are acts making it criminal to take excessive wages; requiring handicraftsmen, meet to labor, to work by the day for their neighbors in certain work; fixing the price of labor; and the like.

In *Allen v. Flood* [1898] App. Cas. 1, the complaint was that certain union iron-workers confederated and threatened to quit unless certain non-members were discharged. In the course of the opinion of HERSCHELL, J., it was said: "A man's right not to work or not to pursue a particular trade or calling, or to determine when or where or with whom he will work, is in law a right of precisely the same nature, and entitled to just the same protection, as a man's right to trade or work;" and in the same case, by Lord WATSON: "It is, in my opinion, the absolute right of every workman to exercise his own option with regard to the persons in whose society he will agree or continue to work."

In *Doremus v. Hennessy,* 176 Ill. 608, 52 N. E. 924, where the employer refused to abide by the prices prescribed by a laundry union, and the members of the union refused to work for her, the court sustained them in so doing, and said: "Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will."

In the somewhat famous case of *Arthur v. Oakes,* 11 C. C. A. 209, 63 Fed. 310, wherein the circuit court, during the labor troubles of 1894, enjoined certain employees from "so quitting . . . as to cripple the property or prevent or hinder the operation of said railroad," the court of appeals, speaking by HARLAN, J., held that was erroneous, as invading the natural rights of men. He said: "It would be an in-

vasion of one's natural liberty to compel him to work for, or to remain in the personal service of, another." "The rule, we think, is without exception that equity will not ·compel the actual, affirmative performance by an employee of merely personal services, any more than it will compel an employer to retain in his personal service one who, no matter for what cause, is not acceptable to him for service of that character." It was there further held that it was error to enjoin the employees from "striking," for the reason that included in the meaning of the word· "strike" was the mere concurrence of a number of individuals, in the exercise of their inherent right, to quit their employment, which no court ought to interfere with unless they were bound by contract.

Judge Cooley (Torts, p. 278) says: "It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice."

· Mr. Tiedeman (2 Cont. of Pers. & Prop. § 204) says: "Every man has a natural right to hire his services to any one he pleases, or refrain from such hiring; and so, likewise, it is the right of every one to determine whose services he will·hire. . . . Governments, therefore, cannot exert any restraint upon the actions of the parties."

But however well established that the words "liberty" and "pursuit of happiness" include the right of private contract, so that a deprivation of the latter is a deprivation of each of the former, yet the far more difficult question remains whether any given statute constitutes a *forbidden* deprivation.· As we have already said, the constitutional restriction in this respect is not absolute. The very existence of government renders imperative a power to restrain the individual to some extent. This is called the "police power," of which definition has been attempted by jurists and text-writers with so little success as to well-nigh discourage further attempts. It may

be described, though not defined, as the power of the government to regulate conduct and property of some for safety and property of all. But in what degree? In a despotism, absolutely in the discretion of the despot. In a less than despotism, not absolutely, but with *some* limitations. To ascertain and declare those limitations scientifically is, and for long to come will be, the despair and struggle of courts. The present period witnesses unexampled popular consideration and, apparently, belief in the widest scope of governmental activity and interference with the individual. That tendency has affected, and of course will further affect, the legislative representatives of the people, who will undoubtedly deem it their duty to attempt to give it effect in the laws they make. With this tendency as a *policy* of government, courts have nothing to do. If the popular belief in a despotic or a socialistic form of government, such as demands complete surrender of individual liberty, is strong enough and general enough to lead the people to delegate it to the legislature, authority to enforce such surrender will exist, and courts must give full effect to the laws enacted under it. That authority has not yet been given, however; and until the people, in the prescribed manner, shall amend the constitution, the theory of government now written therein must control, and courts must enforce its limitations against legislative attempts to exceed them. While the judiciary is not the guardian of civil rights or liberty in the abstract, it is the guardian of so much thereof as by constitutional restrictions the government is forbidden to disturb.

By the constitution is granted the police power,—the power to restrain the individual of some measure of his liberty of action and of his property; but this goes no further than to authorize the enactment of laws necessary to reasonable protection of the safety and welfare of the general community, and not depriving the individual of liberty in the constitutional sense. By the same instrument, liberty is guaranteed

to the individual; but that means only civil liberty,—that measure of freedom which may be enjoyed in a civilized community consistently with peaceful enjoyment of like freedom in others. Absolute freedom in one is necessarily subversive of liberty for those with whom he comes in contact, unless such others be strong enough to resist and curtail his will. The liberty of one man begins where another's terminates. Such definitions as the foregoing, however, do not greatly advance us toward any *a priori* location of a line of demarcation. They amount to little more than a declaration that police power extends to such measure of restraint as is consistent with liberty; and liberty, that measure of freedom consistent with the police power. This impossibility of exact demarcation characterizes all discussion of the subject, yet the careful expressions of these alternative conceptions of properly limited government, on the one hand, and due freedom from restraint, on the other, are useful when we approach a concrete case. Therefore quotations of some such expressions may be helpful.

The conception of civil liberty has been variously phrased thus: "Every man may claim the fullest liberty to exercise his faculties, compatible with the possession of like liberty by every other." Spencer's Social Statics, 94. "That man is free [under the law]who is protected from injury." 2 Webster's Works (Boston, 1854), 393. "Liberty consists in doing what we ought to will, and in not being constrained to do what we ought not to will." Montesquieu. "Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same rights by others." Field, J., in *Crowley v. Christensen*, 137 U. S. 86, 89, 11 Sup. Ct. 13. "That government can scarcely be deemed to be free where the rights of property are left solely dependent upon the will of a legislative body, without any restraint." Story, J., in *Wilkinson v. Leland*, 2 Pet. 627.

The conception of the function of government to restrain liberty under the police power has called forth the following attempts at expression and definition: "The police power of the state . . . is co-extensive with self-protection, and is not inaptly termed the 'law of overruling necessity.' It may be said to be that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society." *Lake View v. Rose Hill C. Co.* 70 Ill. 191. It is said to be limited only by the legislative discretion, "provided its acts do not go beyond the great principle of securing the public safety." *State v. Noyes,* 47 Me. 189. "If . . . a statute purporting to have been enacted to protect the public health [etc.] has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge." HARLAN, J., in *Mugler v. Kansas,* 123 U. S. 623; 661, 8 Sup. Ct. 273. It is said that laws conflicting with express constitutional prohibitions "can be only such as are so clearly necessary to the safety, comfort, or well-being of society, or so imperatively required by the public necessity, as to lead to the rational and satisfactory conclusion that the framers of the constitution could not . . . have intended to prohibit their exercise in the particular case." CHRISTIANCY, J., in *People v. J. & M. P. R. Co.* 9 Mich. 285. "It must appear, first, that the interests of the public generally, as distinguished from a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive on individuals." *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499. "The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations." *Id.* "Cannot change innocence into guilt, or punish innocence as a crime." CHASE, J., in *Calder v. Bull,* 3 Dall. 386. "Any law which goes beyond

that principle [*Sic utere tuo ut alienum non lædas*]— which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and the general security—cannot be included in the police power of the government." Tiedeman, Cont. of Pers. & Prop. 5. "The general right of every person to pursue any calling, and to do so in his own way, provided that he does not encroach upon the rights of others, cannot be taken away from him by legislative enactment." *Ruhstrat v. People,* 185 Ill. 133, 57 N. E. 41. "Of course, for reasons of public policy, matters of immorality and crime cannot be the subject of contract. But it is not for the legislature alone to declare public policy. If this were so, then any contract can be denounced as against public policy, and the evils our fathers sought to be rid of are with us again." *Niagara F. Ins. Co. v. Cornell* (C. C.) 110 Fed. 816, 822. "The police power of the state extends to all regulations affecting the lives, limbs, health, comfort, good order, morals, peace, and safety of society." CASSODAY, J., in *State v. Heinemann,* 80 Wis. 253, 256, 49 N. W. 818.

Free will in making private contracts, and even in greater degree in refusing to make them, is one of the most important and sacred of the individual rights intended to be protected. That the present act curtails it directly, seriously, and prejudicially, cannot be doubted. The success in life of the employer depends on the efficiency, fidelity, and loyalty of his employees. Without enlarging upon or debating the relative advantages or disadvantages of the labor union, either to its members or to the community at large, it is axiomatic that an employer cannot have undivided fidelity, loyalty, and devotion to his interests from an employee who has given to an association right to control his conduct. He may by its decisions be required to limit the amount of his daily product. He may be restrained from teaching his art to others. He

may be forbidden to work in association with other men whose service the employer desires. He may not be at liberty to work with such machines or upon such materials or products as the employer deems essential to his success. In all these respects he may be disabled from the full degree of usefulness attributable to the same abilities in another who had not yielded up to an association any right to restrain his freedom of will and exertion in his employer's behalf according to the latter's wishes. Such considerations an employer has a right to deem valid reasons for preferring not to jeopardize his success by employing members of organizations. A man who has by agreement or otherwise shackled any of his faculties— even his freedom of will—may well be considered less useful or less desirable by some employers than if free and untrammeled. Whether the workman can find in his membership in such organizations advantages and compensations to offset his lessened desirability in the industrial market is a question each must decide for himself. His right to freedom in so doing is of the same grade and sacredness as that of the employer to consent or refuse to employ him according to the decision he makes. We must not forget that our government is founded on the idea of equality of all individuals before the law. Such restraints as may be placed on one may be placed on another. If the liberty of the employer to contract or refuse to contract may be denied, so may that of the employee. In answering the question now before us, we may not forget the possibility of being called on to answer whether the legislature may make a criminal of the employee who quits, for example, because his employer joins a blacklisting association; because nonunion men or members of some other union are employed, or nonunion or forbidden machines or materials are used; because of an obnoxious foreman; because excessive hours of work are required; because compelled to trade at employer's store or board at his boarding house; or because of any other fact or conduct now considered entirely

adequate reason for refusing or leaving a particular service. If must not be forgotten, if, as counsel for the state argues, the laborer is too weak to meet the employer on equal terms in the field of contract, that he will be far more subject to the latter's control and oppression in the field of politics, and that laws of the above character will surely come, if within the proper province of the legislature, unless, as we have faith to believe, the character and the individuality of the wage earners of the country are sufficient to maintain their independence—both contractual and political—in a field of equal rights under the law, and of full liberty to each to sell and buy labor to and from whom he will.

As already mentioned, recent times have witnessed much increase in legislative activity in the way of interference with individual conduct, and especially with transactions between employer and employee. The views of the courts as to the constitutionality of many such laws are in serious conflict, as illustrated by the following decisions: Statute and common-law prohibition against conspiracies have generally been held invalid so far as they merely prohibit the employee from quitting individually or in concert with others. *Arthur v. Oakes,* 11 C. C. A. 209, 63 Fed. 310; 1 Tiedeman, Cont. of Pers. & Prop. 424, where it is said: "No law could deny him this right, without violating the constitutional principle of liberty of contract, unless he has been engaged to serve for a definite period of time." An act forbidding deductions from wages because of defective work is held invalid, so far as it interferes with the making of contracts for employment, in *Comm. v. Perry,* 155 Mass. 117, 28 N. E. 1126. Acts regulating the time of payment of wages in defiance of contract are held valid in *Skinner v. G. M. Co.* 96 Fed. 735, and in *Opinion of Justices,* 163 Mass. 589, 40 N. E. 713, but invalid in *Leep v. St. L., I. M. & S. R. Co.* 58 Ark. 407, 427, 25 S. W. 75, and *Braceville Coal Co. v. People,* 147 Ill. 66, 35 N. E. 62. Acts in mining regions requiring that payment

shall be based upon coal without screening, so far as they pro-
hibit contracts to the contrary, are held invalid in *Ramsey v.
People,* 142 Ill. 380, 32 N. E. 364, and *Re Preston,* 63 Ohio
St. 428, 59 N. E. 101; valid in *State v. Wilson,* 7 Kan. App.
428, 53 Pac. 371.   Acts prohibiting payment in orders are
held unconstitutional, as invading the liberty of contract, in
*State v. Haun,* 61 Kan. 146, 59 Pac. 340; *Frorer v. People,*
141 Ill. 171, 31 N. E. 395; *State v. Loomis,* 115 Mo. 307, 22
S. W. 350; *Godcharles v. Wigeman,* 113 Pa. St. 431, 6 Atl.
354; and valid in *Dayton C. & I. Co. v. Barton,* 103 Tenn.
604, 53 S. W. 970; *Harbison v. Knoxville I. Co.* 103 Tenn.
421, 53 S. W. 955; *Knoxville I. Co. v. Harbison,* 183 U. S.
13, 22 Sup. Ct. 1; also in *Hancock v. Yaden,* 121 Ind. 366,
23 N. E. 253, but in the last case on the ground that the state
has the right to prohibit the use of anything except legal
tender to circulate as money.   Statutes limiting hours of labor
have been held invalid, as infringing the right of contract, in
*Low v. Rees P. Co.* 41 Neb. 127, 59 N. W. 362, and *Ritchie
v. People,* 155 Ill. 98, 40 N. E. 454, on the ground that his
labor is the property of the workingman, and government has
no power to restrict him in selling it as he deems most to his
advantage. Such legislation is held valid in *Holden v. Hardy,*
169 U. S. 366, 18 Sup. Ct. 383, with reference to labor in
mines, on the ground that long hours are prejudicial to health,
and therefore within proper regulation, under the police
power, to preserve the general health.   An act prohibiting
farriers from shoeing horses without first obtaining a license
is held unconstitutional in Illinois.   *Bessette v. People,* 193
Ill. 334, 62 N. E. 215, 219.

The nearest parallel we have found to the act in question
are laws enacted in Missouri and Illinois, nearly identical
with our law as it existed before the amendment of 1899,
namely, making criminal attempts to coerce employees against
membership in labor unions, by discharge or otherwise.   In
*State v. Julow,* 129 Mo. 163, 31 S. W. 781, such law was held

unconstitutional as unduly invading the liberty of the em-
ployer to make or refuse to make contracts with whom he
pleased. In that case the act committed was merely discharg-
ing an employee, and it was contended that it was prohibited
by the law. The court said: "If an owner," etc., "obeys the
law on which this prosecution rests, he is thereby deprived of
a right and a liberty to contract or terminate a contract as all
others may. . . . We deny the power of the legislature to
do this; to brand as an *offense* that which the constitution
designates and declares to be a *right,* and therefore an *inno-
cent* act.". And further: "Nor can the statute escape censure
by assuming the label of a police regulation. It has none of
the elements or attributes which pertain to such a regulation,
for it does not, in terms or by implication, promote, or tend
to promote, the public health, welfare, comfort, or safety;
and, if it did, the state would not be allowed, under the guise
and pretense of police regulation, to encroach or trample upon
any of the just rights of the citizen, which the constitution
intended to secure against diminution or abridgment." In
*Gillespie v. People,* 188 Ill. 176, 58 N. E. 1007, was con-
sidered a similar act, claimed to be breached by discharging
an employee because he was a member of a certain labor
organization. That court also held the act unconstitutional,
adopting substantially the views of the Missouri court in the
preceding case. The court said: "One citizen cannot be com-
pelled to give employment to another citizen, nor can any one
be compelled to be employed against his will. The act
. . . now under consideration deprives the employer of
the right to terminate his contract with his employee. The
right to terminate such a contract is guaranteed by the or-
ganic law of the state. The legislature is forbidden to de-
prive the employer or employee of the exercise of that right.
The legislature has no authority to pronounce the perform-
ance of an innocent act criminal, when the public health,
safety, comfort, or welfare is not interfered with." "Liberty

includes not only the right to labor, but to refuse to labor, and consequently the right to contract to labor or for labor, and to terminate such contracts, and to refuse to make such contracts."

On this subject Mr. Tiedeman (Cont. of Pers. & Prop. 332) declares the opinion that a state statute which made it unlawful for an employer to refuse to employ union men, or to compel an employee to withdraw from a trade union on pain of dismissal, would be clearly unconstitutional. In Georgia a statute requiring an employer to give to a discharged workman a certificate stating the reasons of the discharge is held unconstitutional on the ground that the right of discharge may be exercised without any reason or explanation. *Wallace v. G., C. & N. R. Co.* 94 Ga. 732, 22 S. E. 579. In Missouri the same principle on which an act prohibiting discharge of men by reason of membership in unions was held unconstitutional in the *Julow Case, supra,* is held to preclude interference with members of a union in soliciting others to refuse to trade with a manufacturer. *Marx & H. J. C. Co. v. Watson* (Mo. Sup.), 67 S. W. 391. In New York, union men are held not liable for compelling discharge of nonunionists by threats to strike. *National Pro. Asso. v. Cumming,* 170 N. Y. 315, 63 N. E. 369. Many other illustrations might be given, but the foregoing suffice to show the confusion among different courts, and probably the general tendency on such subjects.

In considering our own statute under which relator is committed, it must first be noted that we are concerned only with that portion added to pre-existing statutes (sec. 4466*b*, Stats. 1898) by the act of 1899, "No person or corporation shall discharge an employee because he is a member of any labor organization," for the relator is not charged with breach of any other of the provisions of that act. Confining ourselves, then, to the act so charged and the statutory prohibition in-

volved, is it within the legislative power to make criminal the refusal to contract with another for his labor for any reason which the employer deems cogent? We speak of refusal to contract, for, while the act mentions only discharge, it is in no wise limited to situations where there is any contract or other right to continuance of employment, and is obviously intended by the framers to apply generally to the relation of employer and employee, where, as common knowledge assures us, there is usually no term of employment and each day constitutes a new contract. As each morning comes, the employee is free to decide not to work, the employer to decide not to receive him, but for this statute. That the act in question invades the liberty of the employer in an extreme degree, and in a respect entitled to be held sacred, except for the most cogent and urgent countervailing considerations, we have pointed out. Hardly any of the personal civil rights is higher than that of free will in forming and continuing the relation of master and servant. If that may be denied by law, the result is legalized thralldom, not liberty,—certainly not to the laboring men of the country. This aspect of the subject is too clear to warrant further discussion. Is there any conceivable reason to warrant such extreme invasion of individual liberty? Can it be necessary to the reasonable liberty of others under the law? The act here charged as criminal clearly does not deprive any other person of any private or civil right. Its utmost effect is to deny privilege of contract, but no right exists to enter into contract with another against his will. The maxim, *Sic utere tuo ut non alienum lœdas,* cannot justify restraint of acts which do not injure others in their legal rights. We therefore find entirely lacking one of the requisites of the police power to restrain conduct, declared by many authorities to be an essential, namely, that such conduct shall injuriously affect the rights of others. 1 Tiedeman, Cont. of Pers. & Prop. 5; *Ruhstrat v. People,* 185 Ill. 133, 57 N. E. 41; *Niagara F. Ins. Co. v. Cornell* (C. C.) 110 Fed. 816.

But though not directly injurious to the rights of other in-
dividuals, is the forbidden act injurious to the welfare of the
community? Is its prohibition so essential to the existence of
good government that we must assume the constitution build-
ers intended the liberty which they reserved should be subject
to it? Or does it so tend to promotion of public peace or
safety that we can reasonably attribute to the legislation such
a purpose? After most careful consideration, we find our-
selves unable to reach an affirmative answer to any of these
queries. We have sought to give to the legislature the benefit
of every doubt. We have examined the decided cases in great
number; we invited counsel for the state to suggest, and we
have given loose to our own invention and imagination; but
we are unable to discover reason to think that the legislation
is needful for or even calculated to protect public welfare,
though cogent reasons to the contrary readily present them-
selves. Those courts which have sustained the various laws
above mentioned, interfering in some degree with freedom
of contract, when they have discussed the subject, have found
some respect in which the public were interested, or thought
to be. Thus, in forbidding the screening of coal before weigh-
ing, the legislature was held to be exercising merely the rec-
ognized governmental function of regulating weights and
measures. *State v. Wilson,* 7 Kan. App. 428, 53 Pac. 371;
*Yates v. Milwaukee,* 12 Wis. 673. Limiting hours of labor
in mines or of children in factories has been justified by the
peril to general health. *Holden v. Hardy,* 169 U. S. 366, 18
Sup. Ct. 383. Prohibition of payment in orders has been
sustained upon the governmental power to regulate current
money. *Hancock v. Yaden,* 121 Ind. 366, 23 N. E. 253. In
Wisconsin, laws have been treated as or declared valid, though
restricting freedom in conducting business, when was appar-
ent a purpose of promoting or protecting public health in
(slaughter houses) *Taylor v. State,* 35 Wis. 298; (phar-
macists) *State v. Heinemann,* 80 Wis. 253, 49 N. W. 818;

(plumbers) *State ex rel. Winkler v. Benzenberg,* 101 Wis. 172, 76 N. W. 345; (physicians) *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561. Obviously, however, none of these considerations can be involved in the policy underlying the legislation now under consideration.

One menace to public welfare was suggested by counsel for plaintiff in error, based upon the assertion that discharges of employees, especially union men, are likely to be followed by turbulence, violence, and even bloodshed; hence that it was proper to deprive employers of their rights, presumably because they are ordinarily law-abiding and will not make trouble. We decline to acknowledge as a fact that the laboring men, as a class, union or nonunion, are more prone to law-breaking or violence than other classes of the community, or to adopt the theory that the legislature so assumed. But even if that assumption were made, it would constitute no justification for depriving one man of his liberty of contract, that another was likely to commit crimes or breaches of the peace. As well deny the right of private ownership of chattels because they tempt the thief to steal. Neither the restriction imposed nor the penalty is at all relevant to the public purpose sought, nor to the wrongful acts threatened. Nevertheless the suggested purpose seems to have had weight with the supreme court of Tennessee in *Harbison v. Knoxville I. Co., supra* (103 Tenn. 443, and 53 S. W. 960), as justifying an act compelling mining employers to pay in money orders for coal issued to their workmen. Whether the characteristics of wage earners in Tennessee or the conception of liberty are such as to warrant the decision must be left to the courts there. We cannot so view them in Wisconsin. It is the reservation of liberty and pursuit of happiness made by our own constitution, thus limiting the police power conferred upon our legislature, by which we must be controlled. Thereunder we hold that freedom to make, and even more to refuse to make, contracts, whereby no rights of others suffer, cannot be restricted,

unless otherwise will result substantial disturbance of the public health, safety, or welfare, and that even a possible tendency of some persons to wrongfully disturb the peace when thwarted of their will constitutes no justification for restraining others of their just rights; nor, if so, is the present act at all calculated or reasonably necessary to prevent the only suggested menace to the community.

As the legislation clearly and beyond doubt invades the natural liberty of the individual, it must be void, unless we can discover both the existence of a public need, and at least tendency of the statute to provide therefor. In the search for such need and purpose we must and do concede to the legislative branch of the government the fullest exercise of discretion within the realm of reason, and, if a public purpose can be conceived which might rationally be deemed to justify the act, the court cannot further weigh the adequacy of the need or the wisdom of the method. When, however, after all diligence and reflection, we are unable to discover any such public need or purpose, we have no alternative conclusion, save that the legislature has, "under the guise of protecting public interests, arbitrarily interfered with private business and imposed unusual and unnecessary restrictions upon lawful occupations," which it may not do. *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499. It has, then, taken from one his liberty and property, not for a public purpose, but for the benefit of other individuals, which is but robbery under the forms of law. *Citizens' S. & L. Asso. v. Topeka,* 20 Wall. 655, 664.

The act of 1899 is further assailed upon the charge that it is class legislation, not affecting alike all persons similarly situated and conditioned, and therefore prohibited by the requirement of art. I, sec. 1, of our constitution,—that *equal* freedom be preserved to all men,—discussed in *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561, and *Black v. State,* 113 Wis. 205, 89 N. W. 522. This objection was sustained in *State v. Julow,* 129 Mo. 163, 31 S. W. 781, and

*Gillespie v. People,* 188 Ill. 176, 58 N. E. 1007; but, as we have reached the conclusion that the legislation is not within the police power of this state at all, we need not consider whether the attempted exercise of that power is defective.

We agree with the trial court that the enactment under consideration exceeded the limitations imposed by the constitution of Wisconsin upon the legislature. It is therefore void, and conferred no power upon the magistrate to make the commitment under which petitioner was held in custody. His discharge therefrom was not error.

*By the Court.*—The order of the superior court of Milwaukee county is affirmed.